RISTAINO ET AL. *v.* ROSS

No. 74–1216.  Argued December 8–9, 1975—Decided March 3, 1976

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and REHNQUIST, JJ., joined. WHITE, J., filed a statement concurring in the result, *post,* p. 598. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post,* p. 599.  STEVENS, J., took no part in the consideration or decision of the case.

*Barbara A. H. Smith,* Assistant Attorney General of Massachusetts, argued the cause for petitioners.  With her on the briefs were *Francis X. Bellotti,* Attorney General, *John J. Irwin, Jr.,* and *David A. Mills,* Assistant Attorneys General.

*Michael G. West,* by appointment of the Court, 421 U. S. 1009, argued the cause and filed a brief for respondent.

MR. JUSTICE POWELL delivered the opinion of the Court.

Respondent is a Negro convicted in a state court of violent crimes against a white security guard.  The trial

judge denied respondent's motion that a question specifically directed to racial prejudice be asked during *voir dire* in addition to customary questions directed to general bias or prejudice. The narrow issue is whether, under our recent decision in *Ham* v. *South Carolina,* 409 U. S. 524 (1973), respondent was constitutionally entitled to require the asking of a question specifically directed to racial prejudice. The broader issue presented is whether *Ham* announced a requirement applicable whenever there may be a confrontation in a criminal trial between persons of different races or different ethnic origins. We answer both of these questions in the negative.

## I

Respondent, James Ross, Jr., was tried in a Massachusetts court with two other Negroes for armed robbery, assault and battery by means of a dangerous weapon, and assault and battery with intent to murder. The victim of the alleged crimes was a white man employed by Boston University as a uniformed security guard. The *voir dire* of prospective jurors was to be conducted by the court, which was required by statute to inquire generally into prejudice. See n. 3, *infra.* Each defendant, represented by separate counsel, made a written motion that the prospective jurors also be questioned specifically about racial prejudice.[1] Each defendant also moved that the veniremen be asked about affiliations with law enforcement agencies.

The trial judge consulted counsel for the defendants about their motions. After tentatively indicating that

---

[1] The question proposed by Ross, who did not adopt as his own various other questions proposed by his codefendants, was: "5. Are there any of you who believe that a white person is more likely to be telling the truth than a black person?" App. 23.

he "[felt] that no purpose would be accomplished by asking such questions in this instance," the judge invited the views of counsel:

"THE COURT: . . . I thought from something Mr. Donnelly [counsel for a codefendant] said, he might have wanted on the record something which was peculiar to this case, or peculiar to the circumstances which we are operating under here which perhaps he didn't want to say in open court.

"Is there anything peculiar about it, Mr. Donnelly?

"MR. DONNELLY: No, just the fact that the victim is white, and the defendants are black.

"THE COURT: This, unfortunately, is a problem with us, and all we can hope and pray for is that the jurors and all of them take their oaths seriously and understand the spirit of their oath and understand the spirit of what the Court says to them— this Judge anyway—and I am sure all Judges of this Court—would take the time to impress upon them before, during, and after the trial, and before their verdict, that their oath means just what it says, that they are to decide the case on the evidence, with no extraneous considerations.

"I believe that that is the best that can be done with respect to the problems which—as I said, I regard as extremely important . . . ." App. 29–30.

Further discussion persuaded the judge that a question about law enforcement affiliations should be asked because of the victim's status as a security guard.[2] But

---

[2] "MR. DONNELLY: There is only one thing. The only reference I would make to the facts in this case—the victim[']s being white, and that he was a security guard in uniform and acting as a policeman.

"MR. NEWMAN [counsel for Ross]: I think that factor might

he adhered to his decision not to pose a question directed specifically to racial prejudice.

The *voir dire* of five panels of prospective jurors then commenced. The trial judge briefly familiarized each panel with the facts of the case, omitting any reference to racial matters. He then explained to the panel that the clerk would ask a general question about impartiality and a question about affiliations with law enforcement agencies.[3] Consistently with his announced intention to "impress upon [the jurors] . . . that they are to decide the case on the evidence, with no extraneous considerations," the judge preceded the questioning of the panel with an extended discussion of the obligations of jurors.[4]

suggest the question—this was my series of questions—asking the jurors whether any of their relatives are policemen.

. . . . .

"THE COURT: I am going to adopt Mr. Newman's suggestion that we have a double problem here, not only the problem of skin color, but we also have the problem of someone who is a quasi policeman, so I am going to ask . . . [a question] in the area of relations to police . . . ." *Id.*, at 30–31.

[3] The questions were, in substance, the following:

"If any of you are related to the defendants or to the victim, or if any of you have any interest in this case, or have formed an opinion or is sensible of any bias or prejudice, you should make it known to the court at this time.

. . . . .

". . . Are you presently, or have you in the past worked for a police department or a district attorney's office, or do you have any relative who is or was engaged in such work." *Id.*, at 71.

The first question was required by Mass. Gen. Laws Ann., c. 234, § 28 (1959).

[4] He addressed one panel in part as follows:

"[THE COURT:] . . . [U]nder your oath, you have an absolute duty to render a fair and impartial verdicts [*sic*] based upon the evidence that you hear in the courtroom, and no extraneous factors.

"The Clerk in asking you the first question is giving you an opportunity to inform the Court, if you believe that you cannot

After these remarks the clerk posed the questions indicated to the panel. Panelists answering a question affirmatively were questioned individually at the bench by the judge, in the presence of counsel. This procedure led to the excusing of 18 veniremen for cause on grounds of prejudice, including one panelist who admitted a racial bias.[5]

The jury eventually impaneled convicted each defendant of all counts. On direct appeal Ross contended that his federal constitutional rights were violated by the denial of his request that prospective jurors be questioned specifically about racial prejudice. This contention was rejected by the Supreme Judicial Court of Massachusetts, *Commonwealth* v. *Ross*, 361 Mass. 665, 282 N. E. 2d 70 (1972), and Ross sought a writ of certiorari. While his petition was pending, we held in *Ham* that a trial court's failure on request to question veniremen specifically about racial prejudice had denied Ham due process

---

render a fair and impartial verdict on the evidence in this case; giving you an opportunity to inform the Court if you have serious doubt as to whether you can render a fair and impartial verdict on the evidence in the case.

"Under this question, and under your oath, when this question is asked, if you believe that you cannot render a fair and impartial verdict on the evidence in this case, or if you have a doubt as to whether you can so render a fair and impartial verdict on the evidence in the case, you have a duty to inform the Court when that question is asked by standing or raising your hand." App. 72.

[5] At least this venireman knew that the defendants were Negroes. See *id.,* at 42. He was a member of the first panel questioned, and the record shows that immediately before the questioning of that panel the defendants were directed to stand and were "set at the bar to be tried." *Id.,* at 39. It appears that this formality was pursued only before the questioning of the first panel. Cf. *id.,* at 49–50, 73–74, 84, 97. Nothing in the record lodged in this Court indicates whether the veniremen from other panels knew that the defendants were Negroes, although presumably the defendants remained in the courtroom throughout the questioning.

of law. We granted Ross' petition for certiorari and remanded for reconsideration in light of *Ham,* 410 U. S. 901 (1973); the Supreme Judicial Court again affirmed Ross' conviction. *Commonwealth* v. *Ross,* 363 Mass. 665, 296 N. E. 2d 810 (1973). The court reasoned that *Ham* turned on the need for questions about racial prejudice presented by its facts and did not announce "a new broad constitutional principle requiring that [such] questions . . . be put to prospective jurors in all State criminal trials when the defendant is black. . . ." *Id.,* at 671, 296 N. E. 2d, at 815. Ross again sought certiorari, but the writ was denied. 414 U. S. 1080 (1973).

In the present case Ross renewed his contention on collateral attack in federal habeas corpus. Relying on *Ham,* the District Court granted a writ of habeas corpus, and the Court of Appeals for the First Circuit affirmed. 508 F. 2d 754 (1974). The Court of Appeals assumed that *Ham* turned on its facts. But it held that the facts of Ross' case, involving "violence against a white" with "a status close to that of a police officer," presented a need for specific questioning about racial prejudice similar to that in *Ham. Id.,* at 756. We think the Court of Appeals read *Ham* too broadly.

## II

The Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed to matters that conceivably might prejudice veniremen against him. *Ham, supra,* at 527–528. *Voir dire* "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Connors* v. *United States,* 158 U. S. 408, 413 (1895); see *Ham, supra,* at 527–528; *Aldridge* v. *United States,* 283 U. S. 308, 310 (1931). This is so because

the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Rideau* v. *Louisiana,* 373 U. S. 723, 733 (1963) (Clark, J., dissenting). Thus, the State's obligation to the defendant to impanel an impartial jury [6] generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant. *Ham, supra,* at 527–528.

In *Ham,* however, we recognized that some cases may present circumstances in which an impermissible threat to the fair trial guaranteed by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during *voir dire.* *Ham* involved a Negro tried in South Carolina courts for possession of marihuana. He was well known in the locale of his trial as a civil rights activist, and his defense was that law enforcement officials had framed him on the narcotics charge to "get him" for those activities. Despite the circumstances, the trial judge denied Ham's request that the court-conducted *voir dire* include questions specifically directed to racial prejudice.[7] We reversed the judgment of conviction because "the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the [defendant] be permitted to have the

---

[6] A criminal defendant in a state court is guaranteed an "impartial jury" by the Sixth Amendment as applicable to the States through the Fourteenth Amendment. *Duncan* v. *Louisiana,* 391 U. S. 145 (1968). Principles of due process also guarantee a defendant an impartial jury. See, *e. g., Irvin* v. *Dowd,* 366 U. S. 717, 722 (1961).

[7] The questions proposed by Ham were:

"1. Would you fairly try this case on the basis of the evidence and disregarding the defendant's race?

"2. You have no prejudice against negroes? Against black people? You would not be influenced by the use of the term 'black'?" 409 U. S., at 525 n. 2.

jurors interrogated [during *voir dire*] on the issue of racial bias." 409 U. S., at 527.

By its terms *Ham* did not announce a requirement of universal applicability.[8] Rather, it reflected an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as "indifferent as [they stand] unsworne." Coke on Littleton 155b (19th ed. 1832). In this approach *Ham* was consistent with other determinations by this Court that a State had denied a defendant due process by failing to impanel an impartial jury. See *Irvin* v. *Dowd,* 366 U. S. 717 (1961); *Rideau* v. *Louisiana, supra; Turner* v. *Louisiana,* 379 U. S. 466 (1965); cf. *Avery* v. *Georgia,* 345 U. S. 559 (1953).

The circumstances in *Ham* strongly suggested the need for *voir dire* to include specific questioning about racial prejudice. Ham's defense was that he had been framed because of his civil rights activities. His prom-

---

[8] In defending the judgment of the Court of Appeals Ross argues for a sweeping *per se* rule. At least where crimes of violence are involved, he would require defense motions for *voir dire* on racial prejudice to be granted in any case where the defendant was of a different race from the victim. He would require a similar result whenever any defendant sought *voir dire* on racial prejudice because of the race of his own or adverse witnesses. Tr. of Oral Arg. 29–34. We note that such a *per se* rule could not, in principle, be limited to cases involving possible racial prejudice. It would apply with equal force whenever *voir dire* questioning about ethnic origins was sought, and its logic could encompass questions concerning other factors, such as religious affiliation or national origin. See *Aldridge* v. *United States,* 283 U. S. 308, 313 (1931). In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion. See *Connors* v. *United States,* 158 U. S. 408, 415 (1895).

inence in the community as a civil rights activist, if not already known to veniremen, inevitably would have been revealed to the members of the jury in the course of his presentation of that defense. Racial issues therefore were inextricably bound up with the conduct of the trial. Further, Ham's reputation as a civil rights activist and the defense he interposed were likely to intensify any prejudice that individual members of the jury might harbor. In such circumstances we deemed a *voir dire* that included questioning specifically directed to racial prejudice, when sought by Ham, necessary to meet the constitutional requirement that an impartial jury be impaneled.

We do not agree with the Court of Appeals that the need to question veniremen specifically about racial prejudice also rose to constitutional dimensions in this case.[9] The mere fact that the victim of the crimes alleged was a white man and the defendants were Negroes was less likely to distort the trial than were the special factors involved in *Ham*. The victim's status as a security officer, also relied upon by the Court of Appeals, was cited by respective defense counsel primarily as a separate source of prejudice, not as an aggravating racial factor,

---

[9] Although we hold that *voir dire* questioning directed to racial prejudice was not constitutionally required, the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant. Under our supervisory power we would have required as much of a federal court faced with the circumstances here. See *Aldridge v. United States, supra;* cf. *United States v. Walker,* 491 F. 2d 236 (CA9), cert. denied, 416 U. S. 990 (1974); *United States v. Booker,* 480 F. 2d 1310 (CA7 1973). The States also are free to allow or require questions not demanded by the Constitution. In fact, the Supreme Judicial Court of Massachusetts has suggested guidelines to Massachusetts trial courts for questioning about racial prejudice on *voir dire. Commonwealth v. Lumley,* —— Mass. ——, 327 N. E. 2d 683 (1975); *Commonwealth v. Ross,* 363 Mass. 665, 673, 296 N. E. 2d 810, 816 (1973).

see n. 2, *supra,* and the trial judge dealt with it by his question about law-enforcement affiliations.[10] The circumstances thus did not suggest a significant likelihood that racial prejudice might infect Ross' trial. This was made clear to the trial judge when Ross was unable to support his motion concerning *voir dire* by pointing to racial factors such as existed in *Ham* or others of comparable significance. In these circumstances, the trial judge acted within the Constitution in determining that the demands of due process could be satisfied by his more generalized but thorough inquiry into the impartiality of the veniremen. Accordingly, the judgment is

*Reversed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE WHITE concurs in the result on the ground that *Ham* v. *South Carolina,* 409 U. S. 524 (1973), announced a new constitutional rule applicable to federal and state criminal trials and that this rule should not be applied retroactively to cases such as this involving trials which occurred prior to the decision in *Ham.*

---

[10] The facts here resemble in many respects those in *Aldridge, supra,* where the Court overturned the conviction of a Negro for the murder of a white policeman because the federal trial judge had refused the defendant's request that the venire be questioned about racial prejudice. *Ham* relied in part on *Aldridge* in finding that the inquiry into racial prejudice on *voir dire* sought in *Ham* had "constitutional stature." 409 U. S., at 528. While *Aldridge* was one factor relevant to the constitutional decision in *Ham,* we did not rely directly on its precedential force. Rather, we noted that *Aldridge* "was not expressly grounded upon any constitutional requirement." 409 U. S., at 526. In light of our holding today, the actual result in *Aldridge* should be recognized as an exercise of our supervisory power over federal courts. Cf. n. 9, *supra.*

Mr. Justice Marshall, with whom Mr. Justice Brennan joins, dissenting.

In 1973, the Court refused to review the affirmance on direct appeal of Mr. Ross' conviction. 414 U. S. 1080. In dissenting from that refusal, I observed that "[t]o deny this petition for certiorari is to see our decision in *Ham* v. *South Carolina*, [409 U. S. 524 (1973),] stillborn and to write an epitaph for those 'essential demands of fairness' recognized by this Court 40 years ago in *Aldridge* [v. *United States*, 283 U. S. 308 (1931)]." *Id.*, at 1085. Today, in reversing the Court of Appeals' affirmance of the District Court's grant of a writ of habeas corpus, the Court emphatically confirms that the promises inherent in *Ham* and *Aldridge* will not be fulfilled. For the reasons expressed in my dissent from the earlier denial of certiorari, I cannot join in this confirmation. Accordingly, I respectfully dissent.