983 F.2d 1070
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lawrence WATSON, Defendant-Appellant.
 No. 92-3052.
 United States Court of Appeals, Sixth Circuit.
 Jan. 21, 1993.
 
 Before MILBURN and ALAN E. NORRIS, Circuit Judges, and RUBIN, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant, Lawrence Watson, appeals from his conviction for robbery of a credit union and possession of currency stolen from another credit union. He asserts error in the trial court's conduct of voir dire, suppression rulings, refusal to sever charges, jury instructions, and sentencing. Finding these arguments without merit, we affirm the conviction.
 
 I.
 
 2
 On June 7, 1991, the RTA Brooklyn Federal Credit Union ("RTA") in Cleveland, Ohio, was robbed by two men wearing grey ski masks and carrying handguns. During the robbery, one of them herded credit union employees into a back room at gunpoint. He then reached into a brown paper bag and pulled out a roll of duct tape, which the victims believed he was going to use to bind and gag them. He dropped the bag and a receipt fell out. The robbers were prompted to leave when an automobile alarm sounded in the distance. They escaped with $6,596.97, but left behind the tape, bag, and receipt. Cleveland police lifted a fingerprint from the receipt and matched it to Watson's right thumb print.
 
 
 3
 On August 8, the B.F. Goodrich Credit Union ("BFG") in Avon Lake, Ohio, was robbed of $96,852.75 in federally insured funds by three men carrying handguns and wearing grey ski masks. Some of the money was enclosed in bags or wrappers from the Federal Reserve. Credit union employees were able to pinpoint the serial numbers of 500 of the $20 bills that had been stolen.
 
 
 4
 In the week prior to August 12, the FBI received from the same individual seven anonymous phone tips that Watson was staying with Darryl Lemon in the vicinity of John Adams High School, and was responsible for several recent credit union thefts. The FBI traced Lemon to 10511 Reno in Cleveland, which was in the neighborhood mentioned by the caller.
 
 
 5
 On August 10, an FBI agent spotted Watson driving a 1984 white Pontiac. A witness to the BFG robbery had described the robbers' getaway car as a 1984 or 1985 white, four-door GMC or Cutlass, and testified during the trial that the 1984 white Pontiac "look[ed] like the car that was at the bank" during the holdup.
 
 
 6
 On the morning of August 13, agents discovered the white Pontiac in the driveway of 10511 Reno, and FBI agents and Cleveland police officers proceeded to the address to execute the arrest warrant they held for Watson, believing they would find him inside.
 
 
 7
 The agents entered the house and found Watson on the second floor, clothed only in his underwear. According to the agents, he told them he was "Daniel Southern" and directed them to look at identification he had in a pair of trousers in an adjoining room. The agents found a driver's license bearing Watson's photograph, the name "Daniel Southern," and a social security number not assigned to Watson.
 
 
 8
 After arresting Watson, one of the agents conducted what he described as a "protective sweep" of the second floor to determine if there were any individuals who could threaten the officers' safety. The agent encountered a woman in a room approximately ten to fifteen feet from where Watson had been discovered. Nearby was a couch on which jewelry was stacked on top of a pile of what appeared to be uncirculated United States currency. The woman claimed ownership of the jewelry, but denied any knowledge of the cash. Since the agent deemed it "unusual" to find so many bills in an uncirculated state, he concluded they were "contraband" from the robberies and seized them. The serial numbers on twenty-six of the $20 bills corresponded to those stolen in the BFG robbery. The bills were also stacked in order of their serial numbers.
 
 
 9
 The five-count indictment against Watson charged him with: (1) armed robbery of the RTA in violation of 18 U.S.C. §§ 2113(a), (d) and (2); (2) knowingly using a firearm during the RTA theft in violation of 18 U.S.C. § 924(c)(1); (3) being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1); (4) falsely representing his social security number to the Ohio Bureau of Motor Vehicles with intent to deceive and obtain a driver's license in the name of Daniel T. Southern under 42 U.S.C. § 408(a)(7)(B); and (5) knowingly possessing approximately $910 in currency stolen during the BFG robbery in violation of 18 U.S.C. § 2113(c).
 
 
 10
 Watson moved to suppress evidence of the driver's license and currency seized during the arrest. The district court denied this motion after an evidentiary hearing. He also was unsuccessful in seeking severance of the last two counts of the indictment. During voir dire of prospective jurors, Watson, a black male, objected to the absence of black men on the jury panel.[1] The district judge overruled the objection and also rejected a request by defense counsel "to see if the jurors have any prejudice as [sic] a black individual being on trial."
 
 
 11
 The government later withdrew Count 3, and the jury found Watson guilty on Counts 1, 2, 4, and 5. The judge determined he was a Category VI "career offender" pursuant to section 4B1.1 of the Sentencing Guidelines, and sentenced him to 262 months on Counts 1, 4, and 5, plus a consecutive sentence of five years on Count 2.
 
 II.
 
 12
 Watson first asserts that the district court denied him a fair trial by impairing his right to use his peremptory challenges effectively. He contends that this occurred when the district judge refused his request to inquire on voir dire whether "the jurors have any prejudice as [sic] a black individual being on trial."
 
 
 13
 Rule 24(a) of the Federal Rules of Criminal Procedure affords the trial court broad discretion in conducting voir dire examination of prospective jurors. The district court's exercise of this broad discretion will not be disturbed, absent a clear showing of abuse. United States v. Whitt, 718 F.2d 1494, 1497 (10th Cir.1983).
 
 
 14
 In Ristaino v. Ross, 424 U.S. 589 (1975), the Supreme Court held that the Constitution does not entitle a defendant to have questions posed during voir dire that are specifically directed to each and every subject (such as race) that conceivably might prejudice venire members against him. Id. at 594. When the defendant cannot point to special circumstances beyond the "mere fact" of his race, a trial court may act within the parameters of the Constitution if it determines that due process can be satisfied by a more generalized, but thorough, inquiry into the impartiality of the venire members. Id. at 597-98.
 
 
 15
 The essence of Watson's contention is that the district court abused its discretion by failing to provide him with the kind of information he required to utilize his peremptory challenges intelligently. See United States v. Blanton, 700 F.2d 298, 309 (6th Cir.) (voir dire must provide enough information to allow effective use of peremptory challenges), opinion modified on other grounds, 719 F.2d 815 (1983) (en banc), cert. denied, 465 U.S. 1099 (1984). The district court's voir dire did not violate these standards. There was nothing in the circumstances of Watson's case to indicate a need to question prospective jurors specifically about racial prejudice. See Ristaino, 424 U.S. at 597-98. In addition to one general question about "prejudice or sympathy," which did bring about the removal of one juror, the judge elicited information about the venire members' potential involvement with criminal law or lawyers, any previous service in the criminal justice system, and whether they knew of any other reason why they could not serve as fair and impartial jurors. Watson has not demonstrated that this questioning was so inadequate that it constituted a clear abuse of discretion.
 
 III.
 
 16
 Watson also challenges the district court's rulings that the agents' entry into the house to arrest him did not violate the Fourth Amendment; that he consented to the search resulting in the recovery of the driver's license; and that the currency was properly seized under the plain view doctrine during a "protective sweep" of the premises. When reviewing rulings on the suppression of evidence, this court accepts the district court's factual findings unless they are clearly erroneous, but reviews de novo its application of the law to the facts. See United States v. Sangineto-Miranda, 859 F.2d 1501, 1512 (6th Cir.1988).
 
 A. Entry Into the House at 10511 Reno
 
 17
 Watson contends that the entry was illegal in the absence of a search warrant. Here, the officers had only an arrest warrant. In Payton v. New York, 445 U.S. 573, 603 (1980), the Supreme Court held that an arrest warrant founded upon probable cause implicitly carries with it the limited authority to enter a dwelling in which the subject lives when there is reason to believe the subject is inside. In United States v. Buckner, 717 F.2d 297, 300 (6th Cir.1983), this court concluded that the Payton doctrine authorized entry into a third party's house to arrest an individual named in an arrest warrant.
 
 
 18
 In this case, the agents had a proper arrest warrant for Watson and, as the district court also found, the agents had probable cause to believe that he was at 10511 Reno at the time they entered the house to arrest him. These findings are supported by the evidence. Accordingly, the agents' entry under the authority of the arrest warrant was lawful under Payton and Buckner.
 
 B. Seizure of the License
 
 19
 The agents testified that Watson claimed to be Daniel Southern and directed them to the driver's license in his trousers to verify that identity. Watson conceded that he had offered a false identity, but denied saying he had identifcation with that name, or giving the agents his consent to look for it in his trousers.
 
 
 20
 After hearing extensive testimony, the district court found the agents' story to be more credible than Watson's, and denied his motion to suppress the license. The court based its findings on its decision to credit the testimony of one of two witnesses, each of whom told a facially plausible story that was not contradicted by extrinsic evidence. In such circumstances, the judge's finding, if not internally inconsistent, can virtually never be regarded as clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 575 (1985); United States v. McNeal, 955 F.2d 1067, 1074 (6th Cir.), cert. denied, 112 S.Ct. 3039 (1992). Accordingly, Watson has failed to demonstrate error in the trial court's refusal to suppress the driver's license.
 
 C. Seizure of the Currency
 
 21
 Watson contends that the "protective sweep," which resulted in discovery of the currency, exceeded constitutional limits. In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court held that the Fourth Amendment permits a properly limited "protective sweep" in conjunction with an in-home arrest when the searching officer possesses a reasonable belief, based upon specific and articulable facts, that the area to be swept harbors an individual posing a danger to those on the arrest scene. Id. at 337. Such a sweep "may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-36. During the sweep, if police officers see items in plain view and have probable cause to believe those items are evidence of a crime, they may seize them. See id. at 330; Arizona v. Hicks, 480 U.S. 321, 326-27 (1987) (probable cause required to invoke plain view doctrine).
 
 
 22
 Thus, the legality of the seizure of the currency turns first on whether the agent's sweep was within the limits of Buie and, second, on whether his discovery of the money during that sweep gave him probable cause to believe that it was evidence of a crime.
 
 
 23
 The agent who conducted the sweep identified specific and articulable facts leading him to believe that the second floor of the house could harbor individuals posing a danger to those on the arrest scene. His concern was well-founded as it turned out, since there was a person near the couch on which the money was stacked. The agent took less than one minute to complete the sweep. Therefore, the agent's conduct conformed with Buie's requirements for a "cursory" protective sweep.
 
 
 24
 The agent also had probable cause to believe that the stack of money he observed in plain view was evidence of a crime, since he observed that the bills "appear[ed] to be absolutely new ... uncirculated almost." During cross-examination, the agent explained further that he "felt it was contraband."
 
 
 25
 Because the search conformed to the requirements of Buie, and the agent had probable cause to believe the currency was evidence of a crime as required by Hicks, the district court properly denied Watson's motion to suppress the currency.
 
 IV.
 
 26
 Prior to trial, Watson moved to sever Counts 4 and 5 from the other counts; the district court denied the motion. He did not renew this motion at the end of the evidence, but argues on appeal that the district court's failure to grant it was reversible error.
 
 
 27
 Ordinarily, the district court's ruling on motions to sever counts of an indictment is subject to review for abuse of discretion. United States v. Harris, 635 F.2d 526, 527 (6th Cir.1980), cert. denied, 451 U.S. 989 (1981). However, this court has also held that "a severance motion will be deemed waived if it is not renewed at the end of the evidence." United States v. Swift, 809 F.2d 320, 323 (6th Cir.1987). Thus, Watson waived his demand for severance by failing to renew the motion, and the district court's refusal to sever the counts may be reviewed only for plain error. Fed.R.Crim.P. 52(b); United States v. Munoz, 894 F.2d 292, 295 (8th Cir.), cert. denied, 495 U.S. 909 (1990). There is no such error in the record before us.
 
 
 28
 Watson also asserts various errors in the district court's use of a standard form jury instruction concerning permissible jury inferences from the possession of stolen property, as well as in the judge's failure to provide a limiting instruction on the scope of those potential inferences. However, none of these arguments was raised at trial. Therefore, they too are subject to review only for plain error. Once again, the record suggests no such error.
 
 
 29
 Watson received a sentence of 262 months for his convictions on Counts 1, 3, and 4, plus a consecutive sentence of an additional sixty months for Count 2. He contends, without elaboration, that this sentence is "excessive."
 
 
 30
 In fact, the judge's sentence falls at the lowest end of the range of permissible sentences under the Sentencing Guidelines. The judge correctly found Watson to be a "career offender" as defined by section 4B1.1 of the Sentencing Guidelines. Since the statutory maximum sentence for armed robbery is twenty-five years, 18 U.S.C. § 2113(a) & (d), section 4B1.1 sets Watson's offense level at 34. U.S.S.G. § 4B1.1(B). With a Category VII criminal history, the applicable guideline range was from 262 to 327 months. The court imposed a sentence of 262 months. The judge was also required by 18 U.S.C. § 924(c)(1) to impose a five-year term for Watson's use of a firearm during the RTA robbery, to run consecutively to the sentence he received for Counts 1, 3, and 4.
 
 
 31
 Watson was therefore exposed to a total sentence ranging from 322 to 387 months. Since he received 322 months, there is no basis for his contending that his sentence was "excessive."
 
 
 32
 For these reasons, the judgments of conviction and sentence are affirmed.
 
 
 
 *
 The Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 As the government points out, there were two black women on the jury panel