694 A.2d 1068

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. IZEL KELLY, JR., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 7, 1997—Decided June 13, 1997.

146

Before Judges PETRELLA, WALLACE, and KIMMELMAN.

*Robert L. Sloan,* Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney; *Mr. Sloan,* of counsel and on the brief).

Appellant *Izel Kelly, Jr.* filed a pro se supplemental brief.

*Nancy Peremes Barton,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General, attorney; *Ms. Barton,* of counsel and on the briefs).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

Tried before a jury, defendant Izel Kelly was convicted of felony murder, contrary to *N.J.S.A.* 2C:11–3a(3), and second degree robbery, contrary to *N.J.S.A.* 2C:15–1. At sentencing, the judge merged the robbery conviction into that for felony murder and sentenced Kelly to seventy years in prison, thirty years parole ineligibility, and assessed $1,000 in VCCB penalties and assessments.

On appeal, Kelly argues that he was denied a fair trial because the trial judge refused to interrogate the jury regarding racial bias during *voir dire.* He also argues, for the first time on appeal, that the judge should have given the jury an identification charge.[1] In a *pro se* supplemental brief, Kelly contends that he was denied his right to a fair trial because the trial court improperly denied his attorney's motion to withdraw.

---

[1] The trial took place in February 1994. The judgment of conviction was entered on March 25, 1994.

On the morning of January 20, 1992, the body of Petronillo Jiminez, a man of Mexican descent, was found dead, laying on the railroad tracks at the Freehold bus station with his jacket pulled up over his head and his torso exposed. His jacket pockets were turned inside out. According to the medical examiner's report, Jiminez died from blunt trauma to the head and neck region with hypothermia as a significant factor.[2]

The previous day Pedro Lopez Garcia met Jiminez at a Freehold laundromat. They spent the day together and eventually ended up at Garcia's apartment, where Jiminez consumed approximately eight beers. Around 10:30 p.m., Jiminez and Garcia left the apartment.

As they exited the apartment building, Garcia noticed a black man, wearing a green jacket and work boots, knocking on the door. Jiminez and Garcia proceeded to walk to the Freehold bus station. Jiminez was going to take a bus home and Garcia was taking a bus to work in Adelphia.

Garcia walked behind the station, near the train tracks. Two black men approached him; one from behind and one in front and asked him for money. Garcia remembered the man in front of him as the same man who was knocking at the apartment door, wearing the same boots and jacket. Jiminez told the men that they did not have any money and they left.

These events were corroborated by another witness, who described the black men as being six-feet-two inches tall; one wearing a gray colored coat and another wearing a darker colored coat, both with hooded sweat shirts. This witness took the same bus with Garcia at 11:00 p.m. As the bus was departing, he saw one of the black men approach Jiminez.

Around 11:15 p.m., Tarshell Parrish drove by the bus station. She noticed two black men, who were about six feet tall with dark

---

[2] On the night of January 19, 1992, temperatures ranged between seven and ten degrees Fahrenheit.

skin, and a Mexican man in the last parking lot next to the bus station. One black man was standing about a foot and a half in front of the Mexican man and one was standing behind. She testified that the Mexican man was "holding his palms up and shaking his head." She did not see anyone else in the area and kept driving.

At 6:48 a.m. on January 20, 1992, a patrolman from the Freehold Borough Police Department was dispatched to the bus station to investigate a report that a man was laying on the tracks and possibly was dead. Located near the body was one of the victim's matching gloves, a broken wine bottle, a dollar bill, a cassette tape and a bottle of breath spray. Another patrolman observed a glove which appeared similar to one worn by defendant's brother James Melvin Kelly in Municipal Court two or three days earlier.

A search warrant was issued for the Kelly residence and during the search, defendant Izel Kelly and his brother James were asked if they would answer some questions at the police station, and they agreed to do so. Izel implicated himself in the robbery, explaining how on the previous evening, he approached two Mexican men on the bus platform and asked for a quarter to use the telephone. Later, he said he and his brother again approached one of the Mexican men, who appeared drunk and demanded money. Izel stated that he stood behind the man while his brother stood in front. According to Izel's statement, the Mexican dropped his wallet and James picked it up and they ran away.

James gave a similar statement to police that night. James eventually pleaded guilty to aggravated manslaughter in connection with the Jiminez homicide and received a twenty year sentence with ten years parole ineligibility. At the plea hearing, he testified that his brother held the victim's arms.

At trial, James Kelly testified that his brother had nothing to do with the robbery. He stated that although Izel did ask the two Mexican men for money, he returned home after making a telephone call. James admitted that he robbed one of the Mexican

men and punched him twice in the jaw. James thought that he knocked the man out. According to James's testimony, another man, Johnnie Jackson, held the victim's arms while he searched the victim's pockets. James admitted losing his glove during the incident.

Before trial, defense counsel requested that the judge ask potential jurors certain questions during *voir dire* regarding racial bias. The prosecutor objected, noting that then the victim's race might be brought into focus. The judge denied the request, not wanting to "unduly bring race into the case." He did, however, question the jurors in general terms regarding bias.

Four groups of potential jurors were eventually called to the court room before a jury was selected. Seventy-five (75) jurors in total were excused; forty-six (46) for cause. Of the jurors excused for cause, eleven had indicated that they were either victims of or knew someone who was a victim of a crime and could not be impartial. Additionally, two jurors told the judge that they could not be impartial because the defendant was a black man.

No witness identified Izel at the trial as one of the assailants, although witnesses were able to identify articles of clothing worn by both men.

We have carefully considered Kelly's argument concerning identification and conclude that it is wholly without merit. *R.* 2:11–3(e)(2). Not only was there no request for an identification charge, but identification could have played no role in the jury's determination. Identification of Kelly by any specific witness was never an issue.

Kelly contends that the trial judge should have granted his attorney's request to question potential jurors during *voir dire* concerning racial bias, and that the failure to do so constitutes reversible error. Kelly's defense attorney requested the judge ask the following two questions:

> Have you ever had any experience in which you were asked for money in public, and if so, what was the race of that person?

Have you ever had any unpleasant experience with a black person which would cause you to view black persons generally in an unfavorable light?

Questions asked during *voir dire* are a matter of judicial discretion, *Rosales–Lopez v. United States,* 451 *U.S.* 182, 189, 101 *S.Ct.* 1629, 1634, 68 *L.Ed.*2d 22, 29 (1981); *State v. Ramseur,* 106 *N.J.* 123, 243–248, 524 *A.*2d 188 (1987); *State v. Loftin,* 287 *N.J.Super.* 76, 105, 670 *A.*2d 557 (App.Div.), *certif. denied,* 144 *N.J.* 175, 675 *A.*2d 1123 (1996), the exercise of which "will ordinarily not be disturbed on appeal." *State v. Murray,* 240 *N.J.Super.* 378, 392, 573 *A.*2d 488 (App.Div.), *certif. denied,* 122 *N.J.* 334, 585 *A.*2d 350 (1990).

Although the United States Supreme Court has stated that "[t]here is no presumption of juror bias for or against members of any particular racial or ethnic groups," *Rosales–Lopez v. United States, supra,* 451 *U.S.* at 190, 101 *S.Ct.* at 1635, 68 *L.Ed.*2d at 30, our courts encourage inquiry into racial bias if requested during *voir dire,* recognizing "that jurors may be racially or ethnically biased against the defendant, even in the absence of an explicitly racially divisive factual situation." *State v. McDougald,* 120 *N.J.* 523, 553, 577 *A.*2d 419 (1990); *see also State v. Ramseur, supra,* 106 *N.J.* at 247, 524 *A.*2d 188 ("Racial prejudice may operate, for instance, when the defendant is black simply because the defendant is black and regardless of the victim's color."). As we explained in *State v. Horcey,* 266 *N.J.Super.* 415, 418, 629 *A.*2d 1367 (App.Div.1993):

Whenever there is a racial or ethnic difference between victim and accused, at defendant's request the trial judge should inquire of the prospective jurors as to whether the disparity will affect their ability to be impartial. *Rosales–Lopez v. United States,* 451 *U.S.* 182, 191, 101 *S.Ct.* 1629, 1635, 68 *L.Ed.*2d 22, 30 (1981); *State v. Ramseur,* 106 *N.J.* 123, 246, 524 *A.*2d 188 (1987); *State v. Long,* 137 *N.J.Super.* 124, 131, 348 *A.*2d 202 (App.Div.1975), *certif. denied,* 70 *N.J.* 143, 358 *A.*2d 190 (1976).

Refusal to ask the potential jurors questions about racial attitudes is error of constitutional magnitude where racial issues are "inextricably bound up with the conduct of the trial," *Ristaino v. Ross,* 424 *U.S.* 589, 597, 96 *S.Ct.* 1017, 1021, 47 *L.Ed.*2d 258, 264 (1976), or where there exists "substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case." *Rosales–Lopez, supra,* 451 *U.S.* at 190, 101 *S.Ct.* at 1635, 68 *L.Ed.*2d at 29.

The refusal, even if not of constitutional dimension, is an abuse of discretion requiring reversal "where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." *Id.* at 191, 101 *S.Ct.* at 1636, 68 *L.Ed.*2d at 30; *State v. Ramseur, supra,* 106 *N.J.* at 244, 524 *A.*2d 188. [*Ibid.*].

Here, the trial judge's refusal to ask specific questions regarding racial bias was not an error of constitutional dimension. Discrete questions concerning racial bias are not mandatory whenever a defendant happens to be a member of a minority group. *See Rosales–Lopez v. United States, supra,* 451 *U.S.* at 189, 101 *S.Ct.* at 1637, 68 *L.Ed.*2d at 29; *Ristaino v. Ross, supra,* 424 *U.S.* at 597, 96 *S.Ct.* at 1021, 47 *L.Ed.*2d at 264; *State v. McDougald, supra,* 120 *N.J.* at 552, 577 *A.*2d 419. Such questions are only necessary when racial issues are "inextricably bound up with" or there are "substantial indications" that they will play a role in the trial. Race was not a factor in this case.

In light of the specific request, it was error for the judge not to have made more of an inquiry into potential racial bias. Although the first of the two questions standing alone might be inappropriate and both questions were not appropriate in form, the judge could have rephrased the questions to probe the issue more thoroughly. Despite our conclusion that the judge mistakenly exercised his discretion in denying defendant's request, we conclude that the error was not "clearly capable of producing an unjust result." *R.* 2:10–2.

Answers elicited during *voir dire* from potential jurors indicate that the judge's questions were effective. Most notably, seven prospective jurors indicated that they could not be impartial because they were either victims of or knew someone who was a victim of a robbery or mugging, and two jurors indicated that they could not be impartial because the defendant was a black man.

Even if there was error, we are satisfied it was not capable of leading "the jury to a result it might otherwise might not have reached." *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971). The jury knew that defendant admitted his participation in the robbery from his statement to police. Additionally, his brother on

two occasions implicated him and three witnesses provided corroborating testimony.

As to defendant's argument, that the trial court abused its discretion by not permitting his attorney to withdraw from the case, we previously decided this issue in an order dated December 2, 1993, on leave to appeal. That order affirmed the decision of the trial court and is final. *See State v. Myers,* 239 *N.J.Super.* 158, 164, 570 *A.*2d 1260 (App.Div.1990), *certif. denied,* 127 *N.J.* 323, 604 *A.*2d 598 (1990). Nothing in the record indicates that defendant was prejudiced by his representation or that he was denied a fair trial.

Affirmed.