NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0063-14T3

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

ANTONIO JONES,

 Defendant-Appellant.

_______________________________

 Argued November 15, 2016 – Remanded December 7, 2016
 Resubmitted June 6, 2017 – Decided August 30, 2017

 Before Judges Espinosa and Guadagno.

 On appeal from Superior Court of New Jersey,
 Law Division, Ocean County, Indictment No.
 12-05-1001.

 Peter Blum, Assistant Deputy Public
 Defender, argued the cause for appellant
 (Joseph E. Krakora, Public Defender,
 attorney; Mr. Blum, of counsel and on the
 brief).

 Nicholas Norcia, Assistant Prosecutor,
 argued the cause for respondent (Joseph D.
 Coronato, Ocean County Prosecutor, attorney;
 Samuel Marzarella, Chief Appellate Attorney,
 of counsel; Mr. Norcia, on the brief).

 Appellant filed a pro se supplemental brief.
PER CURIAM

 This matter returns to us after a remand to the trial court

for a review of defendant's speedy trial motion, considering the

factors set forth in Barker v. Wingo, 407 U.S. 514, 92 S. Ct.

2182, 33 L. Ed. 2d 101 (1972), and to set forth its findings on

the record. At the time we ordered the remand, we determined

the arguments raised in defendant's supplemental pro se brief

lacked sufficient merit to warrant discussion, R. 2:11-3(e)(2),

and deferred any decision on the argument raised in Point I of

defendant's appeal concerning the trial court's refusal to

include a question regarding possible racial bias in the voir

dire of the jury. We now address those issues.

 I.

 In Barker, the United States Supreme Court established a

balancing test that continues to govern the evaluation of claims

of speedy trial violations in all criminal and quasi-criminal

matters. 407 U.S. at 530, 92 S. Ct. at 2192, 33 L. Ed. 2d at

117; State v. Cahill, 213 N.J. 253, 258 (2013). Under this

test, the trial court must assess four non-exclusive factors:

"[l]ength of delay, the reason for the delay, the defendant's

assertion of [the right to speedy trial] and prejudice to the

defendant." Barker, supra, 407 U.S. at 530, 92 S. Ct. at 2192,

33 L. Ed. 2d at 117. Our Supreme Court has instructed that a

 2 A-0063-14T3
delay of more than one year is sufficient to warrant

consideration of the remaining Barker factors. Cahill, supra,

213 N.J. at 266.

 Defendant's trial was conducted two years after his arrest

in February 2012, appreciably longer than the sixteen-month

"unexplained delay" the Court found to be "inordinate and

unreasonable" in Cahill. Id at 258. Following the remand and

the trial court's careful review of the case, the reasons for

the delay have been explored and identified. Of paramount

importance, the trial court found no evidence the State took any

action to deliberately delay the trial, and defendant does not

argue to the contrary. The trial court found the factors that

contributed to the delay included a crowded court calendar,

changes in the judge and defense counsel assigned to the case,

requests for additional discovery, the time taken by the New

Jersey State Police Laboratory to process evidence requests, and

the trial court's own mistaken belief that defense counsel was

seeking a date certain for trial rather than the dismissal of

the indictment as relief in the speedy motion that was filed.

 The trial court identified the periods of delay, the

reasons for delay and its assessment of responsibility for delay

as follows:

 3 A-0063-14T3
 February 2012 to May 2012

 Defendant was arrested and charged with armed robbery and

obstruction of justice on February 8, 2012 and indicted ninety-

eight days later. No reason was given for this delay. The

trial court observed the period was slightly longer than the

ninety days set forth in the current rules. See R. 3:25-

4(b)(1). He found this period "weighs slightly in the

defendant's favor and against the State."

 May 2012 to August 2013

 Defendant's first speedy trial motion was withdrawn, and

the second motion was carried by the court to August 2013, a

period of sixteen months. During that time, there was a

transfer from another judge to the trial court and a change in

defense counsel. During this period, defense counsel requested

more detailed discovery and a six-week adjournment to review the

discovery. There was also a three-week delay due to Hurricane

Sandy.

 On October 24, 2012, defense counsel made another request

for additional discovery: additional MVR videos from a second

patrol car, a booking video and criminal investigation pictures

taken by the Sheriff's Department. The trial court issued an

order requiring that the additional discovery be provided by

January 14, 2013. It was ultimately determined that the booking

 4 A-0063-14T3
video and the MVR did not exist and the court entered an order

on January 15, 2013 to permit defense counsel to inspect the

subject police car and to require the Sheriff's Department to

provide pictures to defense counsel in electronic form so she

could make her own prints without charge.

 In January 2013, defense counsel filed a suppression motion

that, due to the court's calendar, was not heard until May 2013.

The trial court noted the Administrative Office of the Courts

(AOC) report for the 2013-14 fiscal year, which stated Ocean

County had the second highest post-indictment filings and the

highest number of dispositions per judge in the state for that

year. The court further noted that, during this time period,

there was a significant increase in the number of post-

indictment filings in Ocean County.

 Among the items recovered from the crime scene following

defendant's arrest was a "novelty handgun" wrapped in a black

sock. At the suppression hearing in May 2013, it was learned

that the sock had not been sent for DNA analysis despite defense

counsel's request for such testing. The sock was sent to the

lab in June 2013. The trial court found "this lapse of time

[was] due to the inattentiveness of the State" regarding the

items sent for DNA testing. The period was weighed against the

 5 A-0063-14T3
State but, because there was no evidence the delay was

"intentional or . . . strategical," only slightly.

 The court found the delays due to Hurricane Sandy and

defense counsel's request for time to review discovery should

not weigh against the State. The delay attributable to the

State's response to discovery requests "was partly the result of

the State's failure to promptly respond." The trial court found

this a "more neutral" cause for the delay and gave it "slight

weight favoring the defendant."

 The court concluded that, of the sixteen-month delay

between arrest and the speedy trial motion, the State was

responsible for approximately eleven months of the delay and

that this delay was "a result of negligence." The court noted

further that there were "high stakes" in this case because it

was a "three strike case." As a result, the DNA results were

"important" because the results could prove either inculpatory

or exculpatory. Recognizing that the process of obtaining this

evidence "takes more time than just collecting the report," the

court concluded that the lapse of time should be weighted

against the State but given "slight weight."

 August 2013 to February 2014

 This six-month period lasted from the time of defendant's

speedy trial motion to the trial date.

 6 A-0063-14T3
 The trial court observed that, at the August 2 hearing,

defense counsel stated she would like to try the matter sooner

than the scheduled February trial date but "never sought the

dismissal of the matter during the hearing." Rather, she wanted

assurance the trial would proceed in February as she was aware

other trials were being listed for that date.

 The prosecutor expressed a preference for not proceeding

until DNA results on the sock, expected within a few weeks, were

received. The court agreed it would not be prudent until those

results were received as they could be either inculpatory or

exculpatory.

 The court stated the "primary cause" for the delay from

August 2012 to February 2013 was the delay in receiving the DNA

test. Of the six months, the court found approximately one

month was attributable to the court's calendar, holidays and

vacation, and the remaining five months was attributable to the

State.

 In sum, the trial court found that approximately fifteen to

sixteen months of the delay was "primarily due to the State's

actions," although those actions "were not deliberate." As a

result, the court concluded the delay "should only be weighed

against the State slightly."

 7 A-0063-14T3
 Turning to the defendant's assertion of his right to a

speedy trial, the trial court noted that "[a]lthough defendant

asserted his right early, he initially withdrew his application

when he received discovery and then did not assert the

right . . . until well after plea cut-off, and never sought

dismissal on the record." The trial court stated defense

counsel initially filed the motion because "she viewed discovery

as not being forthcoming." At the motion hearing in August

2013, defense counsel "never sought dismissal but only

assurances that the February date would not be adjourned" and a

request that the trial be moved up. The trial court stated, "As

a result, this Court was under the mistaken belief that the

defendant was . . . seeking only to advance [his] rights under

R. 3:25-2[] to ensure that [his] trial date was secure." The

trial court set the trial date accordingly.

 The trial court found this third Barker factor weighs

against the State but did not merit "heavy weight."

 Finally, addressing prejudice to defendant, the trial court

acknowledged that three interests are assessed: prevention of

oppressive pretrial incarceration, minimization of defendant's

anxiety concerns and whether the defense has been impaired by

the delay. See Barker, supra, 407 U.S. at 532, 92 S. Ct. at

2193, 33 L. Ed. 2d at 118; Cahill, supra, 213 N.J. at 266. The

 8 A-0063-14T3
trial court acknowledged the presence of the first two factors.

Turning to the issue of actual prejudice to the defense, the

trial court noted defendant "ha[d] not identified any specific

prejudice arising from the delay. And there has been no

indication that witnesses were lost and memories not as good or

effective at trial."

 Balancing the Barker factors, the trial court found that,

although the delay was significant, it was "not inordinate,"

given the changes in judges, lawyers, the court calendar and

delay in DNA testing. The court concluded the Barker factors

did not weigh in favor of granting the defendant's request for

the dismissal of the indictment.

 In our review, we apply the same framework and standard as

the trial court in evaluating undue delay. State v. Misurella,

421 N.J. Super. 538, 544 (App. Div. 2011). The picture that

emerges from the trial court's findings, which have ample

support in the record, is that, first and foremost, there was no

intentional delay by the State. Although some delays were

attributable to negligence or inattention by the State, there

was no evidence of gross negligence in the handling of discovery

requests or the prosecution of the case. As the trial court

noted, this was a serious offense and a conviction carried dire

consequences for defendant as he would be subject to a sentence

 9 A-0063-14T3
of life imprisonment with no parole under the "three strikes"

law, N.J.S.A. 2C:43-7.1. These circumstances merited the

diligent pursuit of discovery beyond that initially provided

for, as the trial court observed, the evidence had the potential

to exculpate defendant as well as be probative of his guilt.

Defense counsel did diligently pursue these avenues and prodded

the State into greater responsiveness by filing a speedy trial

motion. We also note that some of the delay was caused by the

court's congested calendar and that, rather than simply offer an

explanation that might seem hackneyed, the trial court backed

that observation with support from the AOC report. Thus,

despite delays due to the State's negligence and the court's

scheduling issues, this is not a situation where the

prosecution, defense or adjudication lay fallow while defendant

was incarcerated pending trial.

 While defendant suffered the hardship of waiting for trial,

that alone "is insufficient to constitute meaningful prejudice."

Misurella, supra, 421 N.J. Super. at 546 (quoting State v. Le

Furge, 222 N.J. Super. 92, 99-100 (App. Div. 1988)). As the

trial court observed, the defense was not impaired by the delay

here. There were no witnesses or evidence lost. Therefore, our

balancing of the Barker factors leads us to conclude defendant's

 10 A-0063-14T3
constitutional rights were not violated by the delay before his

trial.

 II.

 In Point I of his appeal, defendant argued:

 A NEW TRIAL SHOULD OCCUR BECAUSE
 THE TRIAL COURT IMPROPERLY REFUSED
 TO QUESTION THE PROSPECTIVE JURORS
 ABOUT POSSIBLE RACIAL BIAS, EVEN
 THOUGH JONES WAS AN AFRICAN-
 AMERICAN MAN AND THE ROBBERY
 COMPLAINANT WAS A WHITE ORTHODOX
 JEWISH MAN. U.S. CONST. AMEND. VI,
 XIV; N.J. CONST. ART. I, PARA. 1,
 10.

 Although we conclude it was an abuse of discretion for the

trial court to decline to ask any questions regarding possible

racial bias during the voir dire, we are not persuaded that

reversal of defendant's conviction is required in this case.

 The evidence at trial can be summarized as follows:

 The victim, C.L., left his apartment at approximately 9:00

p.m. on February 7, 2012, to attend a night session class. He

was accosted by a person who brandished a small black gun and

demanded his money. The person also demanded that C.L. not look

at him. C.L. handed over some cash and his wallet, which

contained an Israeli shekel coin and a 200 shekel note. After

ascertaining that C.L. did not have any car keys on him, the

assailant instructed him to run ahead, but not to turn around.

 11 A-0063-14T3
 C.L., a yeshiva student, proceeded to his school, where his

friend called 9-1-1. C.L. described his assailant to the

dispatcher as "a short stocky, black fellow" wearing a bomber

jacket, dark in color, black or brown.

 Officer Steven Kowaleski responded on behalf of the

Lakewood Police Department. C.L. told him the assailant "was

possibly a black male that was approximately the height of [his]

shoulder and that he was wearing a dark-colored leather jacket."

 Officer Kowaleski also spoke to a neighbor of C.L.'s, Z.K.,

who observed the interaction between C.L. and his assailant and,

initially, "didn't think anything of it." Once Z.K. was told by

a police officer that a mugging had occurred, he told them he

had just seen someone ride off on a bike. The man was

approximately five to ten feet away when he drove past Z.K. and

"muttered . . . to get out of the way." Z.K. stated the man on

the bike "was colored and maybe had a little beard," but he

"wasn't sure if he was black." He told police the man could be

Hispanic. Z.K. further described the person to the officers as

wearing a black jacket, ski hat, and gloves.

 Another resident of the apartment complex, C.K., also

observed the man on the bike in the parking lot. He described

the man as "a black male. He had a beard and he was wearing a

black coat, shiny, fluffy black coat."

 12 A-0063-14T3
 Officer Kowaleski related Z.K.'s description of the suspect

as a heavyset black male wearing a dark leather jacket and

possibly on a bicycle to other patrol units in the area.

 Roughly one block east and between six and seven blocks

south of where the incident occurred, Officer Eric Miick

encountered defendant, who was of the appropriate height and

build, wearing a black leather jacket and riding a bicycle.

Officer Miick stopped his patrol vehicle and defendant stopped

his bike, positioning it toward him, approximately eight feet

away. Officer Miick asked defendant "where he was going and

what he was up to." Defendant responded "what's the matter?

What's the matter?" in a very nervous and jittery manner.

Defendant began moving toward the patrol vehicle, so Officer

Miick instructed him to keep his hands out and to back up for

safety reasons. When Officer Miick stepped out of the patrol

car, defendant fled on his bike.

 Officer Miick returned to the patrol car and followed

defendant down the street. He told defendant to stop several

times. Defendant ditched his bike, continued running away and

dropped several items as Officer Miick pursued him on foot.

Eventually, defendant stopped, got on the ground per Officer

Miick's command and was arrested.

 13 A-0063-14T3
 Items recovered from the crime scene and defendant's path

were a black wool hat, a leather jacket, a brown glove and a

"novelty handgun" wrapped in a black sock. When defendant was

arrested, he had a shekel coin in his possession. C.L. was

brought to the scene but was unable to identify defendant,

stating defendant could be his assailant but he was not certain.

 The shekel coin was returned to C.L. He did not, however,

get back his wallet, American money, his credit cards, social

security card, or the 200 shekel note.

 Defendant was convicted of first-degree robbery, N.J.S.A.

2C:15-1, and fourth-degree obstructing the administration of

law, N.J.S.A. 2C:29-1, and was sentenced to an extended term of

life without parole and a concurrent sentence for obstruction.

 III.

 Defendant argues the trial judge erred in failing to

include a question about possible racial bias in voir dire. 1 The

argument pertains to the following request made by defense

counsel:

 We requested that, "Do you believe the crime
 rate is higher in the black community than
 in other racial groups?" And the reason we
 asked for this question is that specifically
 Directive 21-06 specifically states in the
 last paragraph on Standard No. 3,
 Supplemental Questions, that "Racial issues

1
 Defendant is African-American and C.L. is Caucasian.

 14 A-0063-14T3
 are relevant when there is a difference in
 the race of the victim from the race of the
 defendant." Thus, we ask for this question
 to be read.

 If Your Honor were to reject that
 question, we would then ask as a supplement
 that . . . you ask "Tell me about the crime
 in your neighborhood."

 If you were to reject that one, we
 would then settle for the proposed question,
 No. 8, which is about gun control.

 The State did not explicitly object to any of these

requests and stated only that it asked the court to read the

open-ended questions set forth in Directive 4-07. The trial

court responded to the defense request as follows:

 I'm not going to ask any question with
 regard to or instruct with regard to any
 relevant crime rates or question with regard
 to crime rates, as a difference may apply
 culturally or -- or neighborhood-wise. I
 don’t think that’s appropriate. I don’t
 think that would be relevant. I don’t want
 to inject race into this case.

 The judge went on to assure counsel he would be "vigilant

and remind counsel" that peremptory challenges could not be

exercised for reasons of race and that he would "consider" the

cross-racial identification charge if there was an

identification in the case. He ended the discussion by stating,

"Other than that, I don’t think it's appropriate to inject race

or - - or comparative crime rates. So I'm not going to ask any

questions with regard to that."

 15 A-0063-14T3
 "Questions asked during voir dire are a matter of judicial

discretion, the exercise of which 'will ordinarily not be

disturbed on appeal.'" State v. Kelly, 302 N.J. Super. 145, 151

(App. Div. 1997) (citations omitted). Nonetheless, "our courts

encourage inquiry into racial bias if requested during voir

dire, recognizing 'that jurors may be racially or ethnically

biased against the defendant, even in the absence of an

explicitly racially divisive factual situation.'" Ibid.

(quoting State v. McDougald, 120 N.J. 523, 553 (1990)).

"Whenever there is a racial or ethnic difference between victim

and accused, at defendant's request the trial judge should

inquire of the prospective jurors as to whether the disparity

will affect their ability to be impartial." State v. Horcey,

266 N.J. Super. 415, 418 (App. Div. 1993).

 In this case, there was a racial difference between the

victim and the defendant and a request for an instruction that

touched on racial prejudice. Moreover, defendant was charged

with first-degree robbery, a crime of violence. In Rosales-

Lopez v. United States, 451 U.S. 182, 101 S. Ct. 1629, 68 L. Ed.

2d 22 (1981), the United States Supreme Court noted, "federal

trial courts must make such an inquiry when requested by a

defendant accused of a violent crime and where the defendant and

 16 A-0063-14T3
victim are members of different racial or ethnic groups." Id.

at 192, 101 S. Ct. at 1636, 68 L. Ed. 2d at 31 (emphasis added).

 Defendant urges us to reverse, citing our conclusion in

Horcey that it was "reversible error for the trial judge to

refuse a request to ask at least a threshold question about bias

where there is racial disparity and defendant is charged with a

crime of violence." 266 N.J. Super. at 419-20. In a later

decision, we did not find reversal required under similar

circumstances. See State v. Kelly, 302 N.J. Super. 145 (App.

Div. 1997), certif. denied, 156 N.J. 409 (1998) (affirming

defendant's murder and robbery convictions despite trial court's

refusal to question jurors about racial prejudice). We agree

that the circumstances here required the trial judge to ask at

least a threshold question about potential bias,2 but do not

agree that a bright line rule applies to require reversal.

2
 By way of example, Appendix 3 to the New Jersey Judiciary
Bench Manual, which was adopted after the trial of this matter,
provides the following sample question for use in criminal
cases:
 9. It is alleged that the victim and the
 defendant in this matter are not of the same
 race. Would that affect your ability to be
 fair and impartial?

 New Jersey Judiciary Bench Manual on Jury
 Selection, Appendix 3 (Dec. 4, 2014).

 http://home2.courts.judiciary.state.nj.us/forms/repository/
co/pnp/jdgs_bench_man_jury_select.pdf

 17 A-0063-14T3
 A refusal to inquire about potential prejudice is an error

of constitutional magnitude

 where racial issues are 'inextricably bound
 up with the conduct of the trial,' Ristaino
 v. Ross, 424 U.S. 589, 597, 96 S. Ct. 1017,
 1021, 47 L. Ed. 2d 258, 264 (1976), or where
 there exists 'substantial indications of the
 likelihood of racial or ethnic prejudice
 affecting the jurors in a particular case.'
 Rosales-Lopez, supra, 451 U.S. at 190, 101
 S. Ct. at 1635, 68 L. Ed. 2d at 29.

 [Kelly, supra, 302 N.J. Super. at 151.]

 Even if the refusal to make such inquiry does not rise to

the level of constitutional error, it constitutes "an abuse of

discretion requiring reversal 'where the circumstances of the

case indicate that there is a reasonable possibility that racial

or ethnic prejudice might have influenced the jury.'" Id. at

152 (quoting Rosales-Lopez, supra, 451 U.S. at 191, 101 S. Ct.

at 1636, 68 L. Ed. 2d at 30).

 Defendant does not contend that any of the jurors were

tainted by racial prejudice. According to the trial judge,

three jurors appeared to be African-American. The witnesses'

descriptions of the suspect referred to the race of the suspect

but did not include any racially charged words in their

descriptions. Indeed, one witness was equivocal about the race

of the robber and the victim was unable to make a positive

identification. The evidence presented was that of a

 18 A-0063-14T3
straightforward street robbery. Neither the crime itself nor

the reactions of the victim and other witnesses suggested a

racial motive for the robbery or the allegations against

defendant. Compare State v. Harris, 156 N.J. 122, 237 (1998)

(finding race was a central feature of the case "given the

multiple racially motivated statements attributed to defendant,"

such as referring to the victim as a "white bitch" and that he

had "knocked off some white girl," and the crime itself, which

"appeared to have been racially motivated"), with Rosales-Lopez,

supra, 451 U.S. at 191, 101 S. Ct. at 1636, 68 L. Ed. 2d at 30

(finding no reversible error where neither the government's case

nor the defendant's defense involved any allegations of racial

or ethnic prejudice), and Ristaino, supra, 424 U.S. at 597-98,

96 S. Ct. at 1022, 47 L. Ed. 2d at 265 (finding no

constitutional issue where the circumstances did not "suggest a

significant likelihood that racial prejudice might infect

[defendant's] trial," simply due to the "mere fact that the

victim of the crimes alleged was a white man and the defendants

were Negroes"); see also State v. Morton, 155 N.J. 383, 459-60

(1998) (rejecting the argument that failure to conduct voir dire

into the venire persons' racial attitudes was reversible error

where no evidence indicated that any juror was racially biased).

 19 A-0063-14T3
 Although the evidence was not overwhelming, there was

persuasive evidence of defendant's guilt. The one-shekel coin

stolen from the victim can fairly be described as an item that

is not commonly possessed by the public at large. The fact that

defendant possessed a one-shekel coin soon after and in close

proximity to the robbery is therefore highly incriminating. In

addition, his flight from the investigating officer may fairly

be considered evidence of a consciousness of guilt.

 We reiterate that where a defendant accused of a crime of

violence against a victim of a different race asks the trial

judge to ask potential jurors about possible racial bias, the

judge should make at least a threshold inquiry and that the

failure to do so constitutes an abuse of discretion. However,

our examination of the record here, which includes no evidence

the jurors or the trial were tainted by racial bias, leads us to

conclude defendant was not prejudiced by the trial judge's

refusal.

 Affirmed.

 20 A-0063-14T3