UNITED STATES of America, Plaintiff-Appellee,

v.

James Webster GROCE, Charles John Chisolm, Defendants-Appellants.

No. 80–5860.

United States Court of Appeals, Eleventh Circuit.

Aug. 16, 1982.

Anthony F. Gonzalez, Tampa, Fla., Nathan Eden, Key West, Fla., Bennie Lazzara, Jr., Tampa, Fla., for defendants-appellants.

Frank W. Trapp, Lynn Hamilton Cole, Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, HILL and FAY, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Defendants James Groce and Charles Chisolm were apprehended in a fishing boat approximately forty miles off the Florida coast with more than one hundred pounds of marijuana floating in the sea nearby. As a result, each was convicted by a jury on three counts of willfully conspiring to import marijuana, and possession with intent to distribute the controlled substance within the United States. They appeal their convictions by challenging the voir dire procedure of the district court, the admission of a nautical chart and related testimony into evidence, the sufficiency of the evidence sustaining their convictions, and the trial judge's failure to instruct the jury as to the voluntariness of defendant Chisolm's admission. Because all four challenges fail to support a finding of reversible error, we affirm.

## FACTS

On July 9, 1980, at about 9:00 a. m. the Coast Guard Cutter Point Swift spotted a sixty-six foot wooden shrimping vessel approximately forty miles southwest of Florida. The vessel, Shrimp Chaser I, appeared to be drifting in the open waters of the Gulf of Mexico, but as the Point Swift approached, Shrimp Chaser I began to head due west away from Florida. Chief Harry F. Turpin, Captain of the Point Swift, pulled within a mile of the Shrimp Chaser I and turned on his hailing light and sirens. Maneuvering his boat closer, Turpin saw Charles Chisolm standing beside the pilot house of the shrimp boat. Turpin attempted to stop the boat by identifying himself as the United States Coast Guard, and as he was shouting he saw defendant James Groce run to the stern of the Shrimp Chaser I and toss six plastic garbage bags and two burlap bales overboard.

At this point, the Shrimp Chaser I abandoned its due west course. It shifted in the water erratically, and then headed toward the Point Swift on a collision course. To avoid being rammed, Turpin shouted on his P.A. hailer system that he would open fire if the approaching vessel did not halt. The Shrimp Chaser I immediately stopped its engines, and four Coast Guard crewmembers boarded the shrimper.

The boarding party, commanded by Petty Officer William Barts, handcuffed Chisolm and Groce and had them remain near the rear of the boat while the Coast Guard crewmembers searched for weapons and other people. Chisolm and Groce were alone, and Chisolm identified himself as the Captain.

In the meantime, Chief Turpin directed the Point Swift to where he had seen Groce dump the bags and bales overboard. Using a boat hook and a small rubber boat, two bags and one bale were recovered; five or six other plastic bags were broken by the hook with their contents falling into the sea. Turpin then returned to the Shrimp Chaser I and ordered that defendants be arrested, read their rights, and transported back to St. Petersburg, Florida.

Once in Florida, and after being read his rights a second time, Chisolm told DEA Special Agent Lowell Miller that the Shrimp Chaser I left Key West, Florida on July 3, 1980 to shrimp and was planning to return to Key West. At trial, however, Officer Barts, a shrimping expert, testified that the Shrimp Chaser I was not rigged for shrimping. Its nets were not positioned properly, and the vessel had no ice in the hold which would preserve the captured shrimp. In addition, a subsequent inspection of the boat by a customs agent revealed traces of marijuana in the rear of the boat and on the galley table. The cus-

toms agent also corroborated Officer Barts' opinion that if the boat had been shrimping, the hold would have been dirty and full of ice. Instead, the hold was unusually clean and contained marijuana seeds and leaves.

On the boat's galley table, officials found a partially unfolded navigation chart indicating the southwestern coast of Florida and a Spanish comic book printed in Colombia. Another chart, two spiral notepads, and one half of a Colombian peso also were found in the captain's quarters. Further testimony indicated that a customary method of identification for rendezvousing ships involved in drug smuggling is for each ship to carry one half of a Colombian peso. When they meet, if the two halves match, the identification is verified.

On this and other evidence Chisolm and Groce were convicted of conspiring to import marijuana into the United States in violation of 21 U.S.C. § 952 and 21 U.S.C. § 963, conspiring to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, and possession with intent to distribute marijuana within the United States in violation of 21 U.S.C. § 841(a)(1). Each man was sentenced to three three-year terms to run concurrently, and both have filed a timely notice of appeal.

## VOIR DIRE

■ Chisolm and Groce, both black men, initially maintain that their convictions should be reversed because of the trial judge's refusal to ask prospective jurors whether racial prejudice would influence the juror's verdict. Defense counsel requested that veniremen be asked the following question after the court's preliminary examination of the panel:

Does the fact that the Defendants in this case are black influence or prejudice your decision in this case either for or against the Defendant or for or against the government.

Despite defense counsel's position that the question could provide valuable insight, the trial judge refused the request because of his belief that no prospective juror would admit openly to racial prejudice. Because we find that the refusal to ask this question had the potential to interfere with defense counsel's exercise of peremptory challenges in the selection of jurors, we conclude that the trial judge acted improperly. However, under the standard recently enunciated in *Rosales-Lopez v. United States*, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981), we also must conclude that the error fails to constitute reversible error.

Before *Rosales-Lopez*, federal courts were uncertain as to whether the refusal to question prospective jurors about racial or ethnic prejudice constituted *per se* reversible error. The Supreme Court, however, rejected the *per se* approach and indicated that a case-by-case analysis of all circumstances is the proper inquiry. 451 U.S. at 192, 101 S.Ct. at 1636; *see also Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). In rejecting the *per se* reversible error rule, the Court nevertheless clearly acknowledges the critical role of voir dire in assuring a criminal defendant's sixth amendment right to an impartial jury and the right to exercise preemptory challenges under Rule 24(b) of the Federal Rules of Criminal Procedure. 451 U.S. at 188, 101 S.Ct. at 1634. Even though a trial judge is afforded broad discretion when conducting voir dire, *see* Fed.R.Crim.P. 24(a), special circumstances can give rise to constitutional requirements with respect to pursuing the possibility of racial or ethnic bias. 451 U.S. at 189, 101 S.Ct. at 1634; *see Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). The Court, therefore, concludes:

In our judgment, it is usually best to allow the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued. Failure to honor his request, however, will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury.

451 U.S. at 191, 101 S.Ct. at 1635.

■ After *Rosales-Lopez*, the better practice is to defer to the judgment of

defense counsel when a voir dire question concerning racial or ethnic prejudice is requested unless, of course, there is "no rational possibility of racial prejudice."[1] Although the trial judge correctly assesses human nature in his observation that most prospective jurors will not admit openly to personal prejudices, we agree with defendants that a valuable credibility judgment can be made from the way in which the question is answered. Such a judgment can prove instrumental in the decision to exercise peremptory challenges. Because the single question requested by defense counsel here would not have burdened the court nor unduly delayed proceedings, it should have been asked. Of course whether the trial court's refusal to ask the question constitutes reversible error is quite another issue.

In order to reverse, we must find a reasonable possibility that racial prejudice might have influenced the jury, and for guidance we turn to the analysis in *Rosales-Lopez* indicating that both internal and external circumstances should be examined for potential prejudice. By internal circumstances, we mean the nature of case and the parties. By external circumstances, we mean the potential for racial prejudice which further questioning may have disclosed. *See* 451 U.S. at 192–93, 101 S.Ct. at 1636.

Typically, reversal is proper when a defendant is accused of committing a violent crime against a member of different racial or ethnic group and the voir dire question is denied. 451 U.S. at 192, 101 S.Ct. at 1636; *e.g., Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). In *Rosales-Lopez*, however, a defendant of Mexican descent was accused of participating in a plan to smuggle illegal aliens into the United States. The crime was nonviolent, the charges were brought by the Government, and no issues involving racial prejudice were raised at trial. 451 U.S. at 192, 101 S.Ct. at 1636. The refusal of the trial court to ask veniremen whether the race or Mexican descent of the defendant would influence their evaluation of the case was held to be a non-reversible error. *Id.* Similarly, the case against Chisolm and Groce lacks both the elements of violence and race differentiation which might give rise to special circumstances requiring reversal. Chisolm and Groce were charged with "victimless" drug violations by the Government and no issues involving racial prejudice were raised at trial.[2] Thus, as in *Rozales-Lopez*, nothing in the nature of the case gives rise to a reasonable possibility of prejudice.

The second inquiry concerns the effectiveness of the trial court in reasonably assuring that prejudice would be discovered if present. *See United States v. Delval*, 600

---

1. Because of the importance of maintaining an atmosphere of impartiality in the courtroom, the general rule is that this type of voir dire request should be granted whenever the defendant can point to a "meaningful ethnic difference between himself and the victim." 451 U.S. at 191 n.7, 101 S.Ct. at 1635 n.7. Although Groce and Chisolm, charged with federal drug violations, cannot point to such an ethnic difference, they do point to a highly charged racial climate in Florida. Just three months before their trial, an all white jury in Tampa, Florida, acquitted white police officers charged with beating to death a black insurance executive in Miami, Florida. The trial, known as the *McDuffee* case, sparked race riots in Miami and racial tension throughout Florida. Although we do not maintain that every minority defendant in Florida now is entitled to question the underlying prejudices of prospective jurors because of this incident, we do recognize that the proximity in time be-

tween the *McDuffee* case and this trial, coupled with the extent of racial tension, created a rational possibility of prejudice, and that defense counsel's request was not irrational. This determination, however, goes only to whether the question should have been asked and not to whether failure to honor the request justifies a reversal.

2. On appeal, defendants suggest that because the jury ultimately was all white the possibility for prejudice was real. As they note in their own brief, however, if any prejudice would arise in a case of this type it would concern attitudes towards marijuana use, a bias which knows no racial bounds. Appellants' Brief at 16. Moreover, the issue of attitudes toward drug use was explored by the trial court during voir dire with at least one prospective juror being dismissed for cause on this basis.

F.2d 1098, 1102–03 (5th Cir. 1979); *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976). Although the trial court refused to question veniremen directly about racial prejudice, steps certainly were taken to assure that the ultimate panel would serve impartially. For example, the trial judge emphasized in opening remarks that over the years everyone acquires certain prejudices, and he went on to explain how such prejudices can impair one's ability to serve on a jury fairly and impartially.[3] After this explanation, each juror was asked individually whether he or she could serve fairly and impartially. Throughout this questioning both defendants were present in the courtroom.

On appeal, Chisolm and Groce maintain that the racial climate in Florida at the time of their trial necessitated direct voir dire questioning on the issue of racial prejudice. Although we acknowledge that their fear of prejudice was not irrational, *supra* note 1, defendants fail to demonstrate a reasonable possibility that jurors might have been influenced by prejudice. First, defendants never raised the issue of racial climate before the trial court; second, even had they raised the issue, the district court judge sitting in Tampa is better able to gauge Tampa's racial climate than we are on appeal, and finally, as discussed above, the trial court did not ignore the issue of prejudice. Although the better practice would have been to honor defendants' request, we cannot say that the trial court abused its discretion, or that its refusal to ask the question created a reasonable possibility that the verdict might have been influenced by prejudice.

3. The court's explanation utilized an analogy to ice cream flavors:

For example, if—if you like ice cream, some of you may like vanilla but not strawberry, for no good reason. You may have eaten too much strawberry as a child or something. But, if that is a fact, you are prejudiced against strawberry ice cream and if this were a case about icer [sic] cream, which it isn't, you would have a difficult time serving fairly and impartially as a juror.

Now, none of you or very few of you—I don't see any gray beards or very elderly

## ADMISSIBILITY

Defendants next challenge the admission of a marked nautical chart indicating the waters surrounding Florida, Cuba, and parts of Mexico. The chart was found partially opened on the galley table of the Shrimp Chaser I and was introduced by the Government during the testimony of Ricky Jay Barrett, an acknowledged nautical charts expert. A clear sheet of plastic was placed over the chart, and Barrett was asked to trace the route of the Shrimp Chaser I on the basis of pencil markings (fixes) appearing on the chart. Barrett opined that the vessel traveled from southern Florida into the Caribbean and was heading back to northern Florida. Defense counsel objected on hearsay grounds, arguing that the Government failed to prove that the markings were made by either Chisolm or Groce. Defendants argued further that they were denied their sixth amendment confrontation rights because the pencil marks were not subject to cross examination. The trial court concluded that the markings were not inadmissible hearsay and we agree.

Despite protests to the contrary, defendants' real complaint is not with the pencil markings on the chart, but rather with the interpretation given those markings by the expert witness. Barrett is the one who determined which of the many pencil marks were relevant in charting the anticipated course of the Shrimp Chaser I. It was his diagram on the plastic overlay which was the circumstantial evidence of defendants' intent to return to the United States. But Barrett's determination hardly can be characterized as a random decision to connect

people, but you all accumulated have acquired considerable experience, considerable amount of life to this point and so, you have accumulated the scars that come with having lived, good and bad, and so, you may have some prejudices which might make it difficult for you to be fair and impartial.

What we want is a group of people who without any previous prejudice can come in here and fairly and impartially try the issues of fact in this particular case.

Record, vol. 3 at 14–15.

the dots. He predicted the course of the Shrimp Chaser I on the basis of Chisolm's statements indicating the boat's date of departure and where defendants were picked up by the Coast Guard. Most importantly, Barrett also had access to another nautical chart found aboard defendants' boat with the same tracklines heading toward northern Florida. In addition, hand-sketched diagrams of the same track lines were found on the last written pages of two spiral notebooks found in the Captain's quarters, and tacked to the chart board in the Captain's quarters.

But defendants do not challenge Barrett's qualifications as an expert. Nor do they deny that they had the opportunity to cross-examine him about his conclusions. Defendants, therefore, were not denied their right to confront the relevant witness. Nevertheless, defendants maintain that Barrett's determination fundamentally is unsound because the Government failed to proffer sufficient evidence to link Chisolm and Groce to the marks. We disagree. Once a *prima facie* case of authorship was made by the Government, the ultimate issue of authenticity properly was sent to the jury for resolution. *Hale v. United States*, 410 F.2d 147, 151–52 (5th Cir.), *cert. denied*, 396 U.S. 902, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *accord Palos v. United States*, 416 F.2d 438, 440 (5th Cir. 1969); *Carbo v. United States*, 314 F.2d 718, 743 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). In light of the additional sketches indicating defendants' intent to return to Florida, the other physical evidence presented at trial, and the fact that the chart was found opened on the galley table, we conclude that a *prima facie* case of authorship was satisfied.[4] *See Hale*, 410 F.2d at 153 (circumstantial evidence of authorship is sufficient to send the matter to the jury).

The district court concluded that the pencil marks are not hearsay because they are not assertions. Under the Federal Rules of Evidence, no oral or written expression is considered hearsay unless it was intended by its maker to be an assertion concerning the matter sought to be proven. Fed.R. Evid. 801(a)(1), (c). This is because when a declarant does not intend to make an assertion, his sincerity generally is not at issue. As a result, the evidence is perceived to be more trustworthy. *See generally* 4 J. Weinstein. *Weinstein's Evidence* ¶ 801(a)[01] (1981). Today, even implied assertions are admissible under this reasoning. *Id.* at 801–55; *e.g., United States v. Zenni*, 492 F.Supp. 464 (E.D.Ky.1980). The test, therefore, is whether Chisolm or Groce intended the marks to represent some statement of their intent to return to the United States.

The Government draws the analogy between the marks on the chart and footprints. Under this theory, Chisolm and Groce marked the chart to indicate their precise location so they would not get lost at sea. By simply noting their current location, defendants make no assertion about their intent to return to the United States. Moreover, their sincerity is not involved because they are not likely to misplace themselves at sea. On the other hand, if Chisolm and Groce sat down and plotted their course and intended to express their intent to return to the United States, the marks could be viewed as assertions; however, such assertions still would be admissible as a coconspirator's statement in furtherance of the conspiracy, regardless of which defendant actually plotted the course. *See United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979).

Thus, we conclude that the chart, the marks, and the expert testimony are admissible as circumstantial evidence of the conspiracy—relevant in that they indicate that defendants had the means to accomplish the conspiracy, and subject to the inference that they had the intent. In any event, the additional circumstantial evidence evincing their intent to return to the United States

---

4. Authorship, in this context, refers to whether or not the pencil marks can be attributed to Chisolm and Groce. *See Carbo*, 314 F.2d at 743.

would render any error in admitting the marked chart harmless.

## SUFFICIENCY OF THE EVIDENCE

The jury's verdict against Chisolm and Groce must be sustained "if there is substantial evidence, taking the view most favorable to the Government to support it" *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The standard we apply is "whether a reasonably minded jury must necessarily entertain a reasonable doubt as to the defendants' guilt." *United States v. Giani*, 678 F.2d 956, 959 (11th Cir. 1982); *see also United States v. Davis*, 679 F.2d 845, 852 (11th Cir. 1982).

■ Defendants allege that the evidence against them is deficient in two respects. Initially, they argue that no proof was offered to demonstrate an actual agreement between Chisolm and Groce to conspire to violate federal drug laws. However, such direct proof is unnecessary to sustain a conviction. When crewmen are found aboard a vessel on which the presence of contraband is obvious, a conspiracy may be inferred. *United States v. Julio-Diaz*, 678 F.2d 1031, 1033 (11th Cir. 1982) (per curiam); *United States v. Ricker*, 670 F.2d 987, 989 (11th Cir. 1982). The fact that Groce was able to throw some of the marijuana overboard does not weaken this inference. First, Chief Turbin witnessed the dumping, and second, traces of marijuana were found throughout the ship.

Defendants also charge that the Government failed to proffer sufficient proof of intent to distribute the marijuana in the United States. The inference that defendants intended to return to the United States with their cargo, however, may be drawn reasonably from the circumstantial evidence presented at trial. As discussed above, all of the charts and diagrams indicate Florida as the ultimate destination of the Shrimp Chaser I. Chisolm, who captained the boat, also told officials that he intended to return to Key West, Florida. In addition, both defendants are United States citizens, and the Shrimp Chaser I had a Florida registration and a Florida shrimping permit on board. When combined with the one half of a Colombian peso, the testimony indicating the use of such pesos as identification devices among drug smugglers, and the presence of the marijuana itself, we are persuaded that the jury was presented with sufficient circumstantial evidence to find a conspiracy.

## VOLUNTARINESS INSTRUCTION

Finally, defendants contend that the trial court erred in failing to instruct the jury about the voluntariness of three relevant statements made by Chisolm after his capture: (1) that he was captain of the Shrimp Chaser I; (2) that the boat left Key West, Florida on July 3, 1979; and (3) that he intended to return to Key West. On appeal, defendants argue that these statements constitute a confession and that the jury should have been instructed on the issue of voluntariness under 18 U.S.C. § 3501(a) (1976) and the Omnibus Crime Control and Safe Street Act of 1968[5] and the weight which should be accorded to Chisolm's statements.

Defendants, however, neither requested a voluntariness instruction nor did they object to the trial court's failure to instruct the jury on the issue. Failure to object in this context ordinarily constitutes a waiver, *see, e.g., United States v. Gonzalez*, 548 F.2d 1185 (5th Cir. 1977), unless the circumstances indicate that the failure to instruct was plain error on the part of the trial

---

5. 18 U.S.C. § 3501(a) reads as follows:

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

court. Fed.R.Crim.P. 30, 52(b); *e.g., United States v. Renteria,* 625 F.2d 1279 (5th Cir. 1980) (defendant's testimony clearly raised the issue of involuntariness). Yet, even if the trial court is guilty of plain error, the failure to instruct the jury on the issue of voluntariness will not form the basis for reversal if it is found harmless and nonprejudicial. *See United States v. Fuentes,* 563 F.2d 527 (2d Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *United States v. Sauls,* 520 F.2d 568 (4th Cir.), *cert. denied* 423 U.S. 1021, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975).

We conclude that the trial court was *not obligated to give a jury instruction* pursuant to section 3501(a) because the voluntariness of Chisolm's statements never arose as a genuine issue of fact at trial. *See United States v. Maher,* 645 F.2d 780, 783 (9th Cir. 1981); *United States v. Fera,* 616 F.2d 590, 595 (1st Cir. 1980), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1981); *United States v. Lewis,* 565 F.2d 1248, 1253 (2d Cir.), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978). At one point, during defense counsel's cross-examination, Chief Turpin established that Chisolm and Groce were transported to St. Petersburg in their underwear, which was all that they were wearing at the time they were apprehended. Moreover, they sat handcuffed on the sun deck of the Point Swift for the duration of the eight hour journey. The issue of voluntariness, however, was not pursued, probably because Chisolm did not admit to anything during this voyage. Chisolm's acknowledgement that he was captain of the ship was made when Barts and the other Coast Guard crewmembers first boarded the Shrimp Chaser I, and his statements concerning the boat's date of departure and expected destination were made after the journey while he was clothed, and after he again was informed of his right to remain silent. We therefore hold that the trial court's failure to instruct the jury in the issue of voluntariness was not plain error. And in light of the overwhelming evidence supporting conviction, if any error occurred it was harmless.

AFFIRMED.