[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12613

_____

D.C. Docket No. 2:12-cr-14054-KMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CAMERON DEAN BATES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 27, 2014)

Before MARTIN, Circuit Judge, and EATON,[*] Judge, and HINKLE,[**] District Judge.

_____

[*] Honorable Richard K. Eaton, United States Court of International Trade Judge, sitting by designation.

[**] Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

MARTIN, Circuit Judge:

Cameron Dean Bates is a federal prisoner serving a 240-month sentence after being convicted of eighteen counts of receiving, accessing, distributing, and possessing child pornography, in violation of 18 U.S.C. § 2252A.  He is also a man who has had sexual relationships with other adult men, a fact that came to be a central issue during his criminal trial.  He challenges his convictions on several grounds.  But we need only consider his argument that he should have been permitted to inquire of potential jurors whether they might harbor prejudice against men who have sex with men.  Specifically, Mr. Bates argues that the District Court abused its discretion when it refused his request to ask prospective jurors during voir dire about any prejudice they might harbor against him on the basis of his sexual activity with other men.  After careful review, and with the benefit of oral argument, we agree with Mr. Bates that the District Court should have examined whether the jurors might bear prejudices against him.  While it is true that Mr. Bates stands charged and convicted of disturbing acts of receiving and distributing child pornography, we cannot condone the manner in which his convictions were obtained.  As a result, we vacate the convictions.

I.

In 2011, the government got information that Mr. Bates was downloading and sharing files depicting child pornography using the internet.  With help from

Mr. Bates's internet providers, the government linked several downloads of child pornography to a computer in Mr. Bates's home as well as a computer in the home of Samuel Gruen,[1] for whom Mr. Bates worked and with whom he had earlier had a sexual relationship.  Over a year after the investigation began, the government got a warrant to search Mr. Bates's home, permitting the seizure of any device capable of downloading or distributing child pornography.  Indeed, the government relied on the warrant to seize and review the contents of a laptop computer.

Investigators discovered the many pornographic pictures and videos they expected to find.  But they also discovered many files revealing intimate details about Mr. Bates's personal life.  For example, the government discovered evidence indicating that Mr. Bates used the internet to meet other men, including Craigslist postings that revealed Mr. Bates's preferred role in sexual relationships.  The government also learned that Mr. Bates sometimes wore women's clothing.  Finally, and important here, the government discovered photos of Mr. Bates engaged in sex acts with other men.

Before trial, Mr. Bates filed a motion to exclude from evidence images depicting him "in sexual activity, nude or in sexual attire," because some people would consider it "shocking or offensive."  Given the prejudice some people

---

[1] The government's investigation also indicated that Mr. Gruen's neighbor's internet connection was used to access child pornography.  Her internet connection was not password protected, and so could be used by anyone within range of the wireless signal.  The neighbor testified that she never used her internet connection to access child pornography.

harbor against homosexual and bisexual people, as well as those who engage in gender non-conforming behavior, Mr. Bates worried that the evidence would unfairly prejudice him. The District Court denied the motion, ruling that evidence of Mr. Bates's private life on his computer "is relevant and probative to establish, inter alia, ownership, possession and identity and such evidence is not unfairly prejudicial." In essence, the government's theory was that Mr. Bates was the person using the computer to download child pornography, because he wouldn't have allowed anyone else to use a computer that held such private content.

After his motion to exclude evidence was denied, Mr. Bates expected evidence of his private life to come out during the trial. He therefore asked the District Court to pose questions to prospective jurors during voir dire about their views on homosexuality, as well as sexual preferences and behavior. The District Court refused to "get into that at this stage." Mr. Bates persisted, pointing out that if the Court refused his request then he would "be prejudiced perhaps by not knowing what the preferences of the jurors are." The District Court responded—curiously, in light of its consideration and ruling on Mr. Bates's motion to exclude evidence—that it did not "know what that has to do with this case." After both Mr. Bates and the government reminded the District Court about the evidence the government intended to present, the Court still declined to inquire of the prospective jurors about whether this evidence of Mr. Bates's sexual activity

4

would prejudice their consideration of his case.[2]  During the trial, evidence of Mr. Bates's sexual relationships with men, the sexually explicit photographs of himself stored on his computer, and his efforts to meet men online was repeatedly paraded before the jury, over several objections from Mr. Bates.  After eight days of testimony, the jury convicted Mr. Bates on all counts.

II.

Jury selection is the primary means by which our judicial system enforces a defendant's constitutional right to be tried by a jury free from prejudices which might unfairly influence its determination of his guilt or innocence.  Gomez v. United States, 490 U.S. 858, 873, 109 S. Ct. 2237, 2246 (1989); see also Murphy v. Florida, 421 U.S. 794, 799, 95 S. Ct. 2031, 2036 (1975) ("The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors." (quotation marks omitted)).  Although the conduct of voir dire is "left to

---

[2] Our friend in dissent characterizes Mr. Bates's conduct at voir dire as "acquiescence in" the District Court's decision not to ask questions about juror prejudice, or at least "surely close" to acquiescence.  See Dissenting Op. at 3.  We do not see it that way.  Mr. Bates stated that he thought the District Court "should be asking some questions relative to homosexuality and preferences of people and so forth."  After the District Court's initial refusal, Mr. Bates persisted, as we have noted, by explaining that he feared prejudice if no questions were asked.  To preserve an objection for appeal, we require a litigant only to "raise [his] point in such clear and simple language that the trial court may not misunderstand it," so as to prevent the trial court from "fail[ing] to grasp" the point.  United States v. Zinn, 321 F.3d 1084, 1087–88 (11th Cir. 2003) (quotation omitted).  Telling a District Judge that you "think [he] should be asking some questions relative to homosexuality and preferences and so forth," as Mr. Bates did, is stating the point in clear and simple language that could not be misunderstood.  Indeed, it is clear that the District Judge in fact understood the request: he specifically denied it, explaining that he didn't see what "questions of homosexuality . . . [had] to do with this case."

the sound discretion of the trial court," United States v. Vera, 701 F.2d 1349, 1355 (11th Cir. 1983), we will reverse a defendant's conviction if it does not meet minimum constitutional requirements.  At a minimum, the District Court's voir dire must "provide reasonable assurance that prejudice will be discovered if present."  United States v. Hill, 643 F.3d 807, 836 (11th Cir. 2011).  When deciding whether a defendant's conviction should be reversed, "the central inquiry is whether the district judge's overall examination, coupled with his charge to the jury, affords a party the protection sought."  United States v. Delval, 600 F.2d 1098, 1102–03 (5th Cir. 1979) (quotation marks omitted).[3]  In his trial, Mr. Bates was not afforded the minimum protection our law requires.

To decide whether the District Court is required to ask questions about a specific, potentially prejudicial topic, we must consider whether "juror prejudices are reasonably suspected."  United States v. Ochoa-Vasquez, 428 F.3d 1015, 1037 (11th Cir. 2005).  To answer this question, we look to all of the circumstances of the case to see if there is "a constitutionally significant likelihood that, absent questioning about [the potential] prejudice, the jurors would not be indifferent as they stand unsworne."  Ristaino v. Ross, 424 U.S. 589, 596, 96 S. Ct. 1017, 1021 (1976) (alteration marks omitted) (quotation marks omitted).  This depends on

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

whether the evidence is (1) in fact a potential source of prejudice, and (2) "inextricably bound up" with the evidence to be presented at trial. Id. at 597, 96 S. Ct. at 1021; see also Ham v. South Carolina, 409 U.S. 524, 533, 93 S. Ct. 848, 854 (1973) (Marshall, J., concurring in part and dissenting in part) ("The trial judge has broad discretion to refuse to ask questions that are irrelevant or vexatious. Thus, where the claimed prejudice is of a novel character, the judge might require a preliminary showing of relevance or of possible prejudice before allowing the questions." (footnote omitted)); United States v. Robinson, 475 F.2d 376, 381 (D.C. Cir. 1973) ("The possibility of prejudice is real, and there is consequent need for a searching voir dire examination, in situations where, for example, the case carries racial overtones, or involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact." (footnotes omitted)).

In this case, the District Court optimistically declared that our society is beyond prejudice on the basis of a person's sexual orientation. While we admire the District Court's optimism, it remains the case that "[t]here will be, on virtually every jury, people who would find the lifestyle and sexual preferences of a homosexual or bisexual person offensive." State v. Ford, 926 P.2d 245, 250 (Mont. 1996); see also United States v. Delgado-Marrero, 744 F.3d 167, 205 (1st

7

Cir. 2014) ("As evinced in part by the government's persistence in hammering the largely irrelevant point of Delgado's same-sex relationship, evidence of homosexuality has the potential to unfairly prejudice a defendant."); Neill v. Gibson, 263 F.3d 1184, 1201 (10th Cir. 2001) ("As the prosecutor knew, emphasizing that Neill was gay likely had a tremendous negative impact on jurors."); United States v. Yazzie, 59 F.3d 807, 811 (9th Cir. 1995) ("[E]vidence of homosexuality can be extremely prejudicial . . . ."); United States v. Ham, 998 F.2d 1247, 1252 (4th Cir. 1993) ("We accept without need of extensive argument that implications of . . . homosexuality . . . unfairly prejudice a defendant." (footnote omitted)).  Cf. PewResearchCenter, The Global Divide on Homosexuality 1–2 (2014) (reporting the results of a 2013 survey, and noting that 33% of respondents in the United States said that homosexuality should not be accepted by society), available at http://www.pewglobal.org/files/2014/05/Pew-Global-Attitudes-Homosexuality-Report-REVISED-MAY-27-2014.pdf.  We have no doubt that evidence of Mr. Bates's sexual activity and gender non-conforming conduct had the potential to unfairly prejudice jurors against him.

It is also clear that Mr. Bates's sexual activities became "inextricably bound up," Ristaino, 424 U.S. at 597, 96 S. Ct. at 1021, with the issues to be resolved at trial.  This fact should have been obvious to the District Court given its ruling before voir dire that it did not intend to exclude the sexually explicit images of Mr.

8

Bates found on his computer. And if it wasn't obvious to the District Court before jury selection began, it should have become obvious when Mr. Bates requested the Court to explore the potential prejudice before striking jurors. When the District Court expressed confusion about what homosexuality "has to do with this case," the government explained that it intended to introduce "pictures and items from the defendant's computer [to] show that he was engaged in homosexual activity[,] . . . which goes to show that he wouldn't be sharing his computer with other people." The government made its intent to offer the graphic and intimate evidence of Mr. Bates's sexual activities clear. Although the Court equivocated at that point on whether it would ultimately admit the evidence, it was clear that Mr. Bates intended to argue that he did not exercise sole control over the computer, and the government would in turn introduce the very personal evidence to counter that defense. This exchange during jury selection and the briefing on Mr. Bates's pre-trial motion to exclude made it quite obvious that facts about his sexual activities were inextricably bound up with a central element of the charges against him. This being the case, the District Court was constitutionally required to ask the questions necessary to "provide reasonable assurance that prejudice [would] be discovered if present." Hill, 643 F.3d at 836 (quotation mark omitted); see also United States v. Ible, 630 F.2d 389, 392, 394–95 (5th Cir. 1980) (noting that the District Court would be expected to ask questions during voir dire about prospective jurors'

9

prejudice on the basis of intemperance, in a trial about counterfeiting in which alcohol consumption arose by virtue of the evidence the government intended to put on to counter Mr. Ible's defense); United States v. Corey, 625 F.2d 704, 707–08 (5th Cir. 1980) (per curiam) (noting that the District Court would need to inquire during voir dire about potential bias against convicted felons like Mr. Corey in a case where his "testimony was going to be vital to [his] defense").

The District Court did not ask any questions that were specific enough to determine whether any of the jurors might harbor prejudices against Mr. Bates based on his sexual relationships. Although the District Court inquired in general terms about the jurors' ability to be impartial, these questions were so broadly framed that they "fail[ed] to reach the important concerns highlighted" by Mr. Bates's proposed inquiry and were not calculated to "reveal latent prejudice." See United States v. Shavers, 615 F.2d 266, 268 (5th Cir. 1980). As a result, the District Court abused its discretion when it failed to inquire about prejudice on the basis of sexual orientation during voir dire. See Corey, 625 F.2d at 707 ("Once a party has raised the spectre of potential actual prejudice, specific and direct questioning is necessary to ferret out those jurors who would not be impartial. Broad, vague questions of the venire will not suffice.").

This is not the end of our inquiry, however. Even where a trial court fails to ask a question that should have been asked, this Court has assessed whether the

10

error is harmless.  See United States v. Bennett, 368 F.3d 1343, 1352 (11th Cir. 2004) (declining to reverse a conviction because in that case "any error resulting from the district court's failure to ask the requested voir dire constitutes harmless error"), opinion reinstated by 131 F. App'x 657 (11th Cir. 2005) (per curiam); United States v. Nash, 910 F.2d 749, 756 (11th Cir. 1990) (same).  We are mindful of the "critical function" voir dire plays "in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored," Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S. Ct. 1629, 1634 (1981) (plurality), so we apply the harmless error standard for constitutional errors set forth in Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).[4]  United States v. Fitzgerald, 74 F.3d 1234, 1996 WL 7987, at *1 (4th Cir. 1996) (unpublished table decision) (noting that the failure to inquire about a potential source of prejudice during voir dire will result in reversal unless the court is "able to declare that the error was harmless beyond a reasonable doubt"); United States v. Johnson, 527 F.2d 1104, 1106 (4th Cir. 1975) ("But even after Ham, the Second Circuit has

_____

[4] In United States v. Groce, 682 F.2d 1359 (11th Cir. 1982), this Court said we will reverse under these circumstances only if there is "a reasonable possibility that racial prejudice might have influenced the jury."  Id. at 1362; see also Rosales-Lopez, 451 U.S. at 191, 101 S. Ct. at 1636 (plurality) (noting that failure to honor a defendant's request to pose a question about racial prejudice during voir dire "will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury").  As the Supreme Court has said, "there is little, if any, difference between . . . 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  Chapman, 386 U.S. at 24, 87 S. Ct. at 828.

11

taken the position that error in failing to inquire as to racial prejudice can be harmless beyond a reasonable doubt.  We are inclined to agree that Ham establishes no per se rule . . . ." (citations omitted)); United States v. Grant, 494 F.2d 120, 121–22 (2d Cir. 1974) (declining to reverse conviction where trial court refused to ask question about racial prejudice because any error "was harmless beyond a reasonable doubt"); United States v. Robinson, 485 F.2d 1157, 1159–60 (3d Cir. 1973) (analyzing failure to ask question about racial prejudice to determine whether the error was harmless beyond a reasonable doubt).

Mr. Bates is therefore entitled to reversal unless the government can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  Chapman, 386 U.S. at 24, 87 S. Ct. at 828.  It is important to understand the proper function of this inquiry.  When applying the Chapman standard, the question

> is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.  That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S. Ct. 2078, 2081–82 (1993).

Applied here, this standard requires us to ask not whether a jury free from the taint of potential prejudice would have rendered a guilty verdict, but whether we are

12

confident beyond a reasonable doubt that this particular jury's verdict was untainted.

The government cannot meet its burden here. Because the District Court refused to ask any questions at all about prejudice on the basis of sexual preferences, we have no way to discern whether the jury was biased against Mr. Bates for that reason. Even the general questions the District Court asked about whether a juror could be fair and impartial does not give us insight into whether any particular juror harbors prejudice against those who engage in same-sex sexual activity. Because the jurors had no reason to know that issues about same-sex sexual practices would be a part of the evidence at trial, they had no reason to offer up prejudices they might harbor on that basis when the District Court posed its general questions. Cf. Bennett, 368 F.3d at 1352 (relying on general inquiry about whether any juror "knows of any reason whatsoever that would cause you to question your ability to serve as a juror in this case," to affirm District Court's refusal to ask voir dire question about whether jurors would be biased based on Mr. Bennett's prior felony conviction, while also noting that the description of the offenses against Mr. Bennett made the jurors "aware that [he] had a prior felony conviction"). This would perhaps be a different case if there had been other voir dire questions that could cull out similar types of prejudice. Cf. United States v. Gassaway, 456 F.2d 624, 626 (5th Cir. 1972) (per curiam) (finding no problem

13

with voir dire process where District Court failed to ask requested question about how jurors would weigh the testimony of an official from the U.S. Post Office, where questions were asked about whether jurors would be biased in favor of the government or its officers).  But there were none.

Here, we cannot be confident that the District Court's limiting instructions were enough to guard against the potential for a juror's prejudice to taint his decision to convict Mr. Bates.  The few limiting instructions given here, so general in nature, cannot cure the constitutional deficiencies in this voir dire process.  Mr. Bates had absolutely no opportunity to identify or remove prospective jurors who might have harbored such strong prejudices that they were incapable of following those limiting instructions.  Beyond that, more often than not, testimony and evidence likely to inflame the prejudices of any juror so inclined was not accompanied by a contemporaneous limiting instruction.  Although we generally presume that jurors follow the instructions they are given, United States v. Butler, 102 F.3d 1191, 1196 (11th Cir. 1997), we cannot conclude beyond a reasonable doubt that the jurors actually did so in this case.

We cannot conclude that the verdict was not tainted by undiscovered prejudices because, among other things, the potential source of prejudice played such a prominent role in Mr. Bates's trial.  This is not a case in which the jury heard about a potentially prejudicial characteristic just fleetingly or rarely.  Cf.

14

Nash, 910 F.2d at 755–56 (noting that a relevant factor when considering whether a District Court commits reversible error when it declines to ask questions about the weight prospective jurors will give to the testimony of government agents is "the importance of the government agent's testimony to the case as a whole" (quotation marks omitted)).  Instead, the jury was repeatedly reminded of Mr. Bates's sexual activities, usually through the government's direct and cross-examinations.  We note that the government asked questions which were at best likely to, and at worst designed to, inflame the prejudices of the jury.[5]

For example, the government asked one witness (not Mr. Bates) several questions that required the witness to explain Mr. Bates's preferred role and position in sexual encounters with other men.  The government even asked this same witness whether he himself personally "prefer[s] to be on the top," a fact which has absolutely no relevance to Mr. Bates's guilt or innocence.  Even more inflammatory was the government's question about whether Mr. Bates and his male lovers ever "had [Mr. Bates's] wife join in" on their sexual liaisons.  Finally,

---

[5] Mr. Bates objected to some of this evidence during the trial on the grounds that it was substantially more prejudicial than probative.  In this appeal, he also challenges the District Court's decision to overrule many of those objections.  Because the conduct of the voir dire alone provides grounds to vacate Mr. Bates's convictions, we do not decide today whether some of the evidence should have been excluded under Federal Rule of Evidence 403.  In declining to decide this issue, we do not sanction the nature of the inquiry undertaken by the government here.  Rather, we are struck by the inflammatory and insensitive way the government framed many of its questions, particularly in light of the fact that the government was well aware that Mr. Bates never had any opportunity to assure that his jury was free from persons who would be prejudiced against him.

the government asked Mr. Bates's brother-in-law whether he knew Mr. Bates was gay, whether he knew Mr. Bates "dressed in women's clothing or took pictures of himself wearing women's clothing," and whether he knew Mr. Bates "took pictures of himself engaged in sexually explicit conduct." These are examples of the descriptive and explicit evidence about Mr. Bates's sexual activities and his gender non-conforming behavior that came up throughout the course of his trial. In light of the quantity and the explicit content of the evidence about Mr. Bates's sexuality paraded before the jury, the risk that latent, undiscovered prejudices may have been inflamed is great.

Indeed, it seems that the government expected the evidence to have exactly that effect at the time it was introduced. After asking one of Mr. Bates's family members whether she knew about his same-sex sexual activities and gender non-conforming behavior, the government followed up with this telling question: "And would that have affected your opinion of him?" We can think of no reason to ask this question but to suggest that, perhaps, it should.

While we are mindful that this witness answered that Mr. Bates's sexuality made no difference to her, we cannot know whether the jurors would have answered the question in the same way. Mr. Bates explained at the start of trial that, in light of the District Court's refusal to inquire into possible homosexual

16

prejudice, we "don't know and no one knows what the prejudice of these [jurors] are relative to homosexuality."

The government cannot carry its burden to show that this error was harmless. If Mr. Bates is to be convicted, we must have sufficient assurances that it is done by a fair and impartial jury of his peers. Here, the risk that Mr. Bates was convicted by jurors who cared less about the charged criminal conduct than about his perfectly legal sexual activity, is intolerably high. His convictions must therefore be vacated, and we remand this case for further proceedings.

Although we do not decide Mr. Bates's argument that the District Court abused its discretion by denying his motions to continue trial, on remand the District Court must assure itself that Mr. Bates has adequate resources to permit his expert to review the evidence, and enough time to pursue the evidence necessary to aid in his defense. Two circumstances of this case raise concern that Mr. Bates was not afforded the time or resources necessary to prepare an adequate defense during his first trial. First, there was a delay of several months in getting approval for funds for an expert. As best we can tell, this delay appears to be due in no small part to the magistrate judge's mistaken understanding of the procedures for getting expert fees in excess of the statutory maximum. The magistrate judge assumed that Mr. Bates's request for excess fees could only be granted if he first obtained permission from the Chief Judge of the Eleventh Circuit. In reality, Mr.

Bates can only make such a request to this Court if the District Court first certifies that the excess amount is "necessary to provide fair compensation for services of an unusual character or duration." 18 U.S.C. § 3006A(e)(3).

Beyond that, even if the magistrate judge did not believe the circumstances warranted excess fees, nothing precluded the judge from granting fees up to the statutory cap earlier in Mr. Bates's efforts to get approval to compensate an expert witness. As a result of the delay, Mr. Bates's expert had only six weeks to conduct his forensic examination of the computer, which we highly doubt afforded the expert sufficient time to review all the evidence. Given the technical nature of the evidence against Mr. Bates, there can be no doubt that the help of a qualified expert is necessary to assist in his defense. Cf. Hinton v. Alabama, 571 U.S. ___, ___, 134 S. Ct. 1081, 1090 (2014) ("Prosecution experts, of course, can sometimes make mistakes. Indeed, we have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts . . . . This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses . . . .").

Second, we are concerned that Mr. Bates did not have enough time to prepare his defense, given that the focus of his prosecution shifted abruptly before trial. Mr. Bates was originally charged on August 23, 2012 in a two count indictment that included only one specific date on which child pornography was

18

allegedly distributed, and gave a range of dates spanning sixteen months over which child pornography was allegedly downloaded or accessed.  On February 14, 2013, just two weeks before trial, the government superseded on the indictment, increasing the number of counts to eighteen and highlighting much more detailed information about the dates and times child pornography was downloaded, accessed, and distributed.  One week after that, the government disclosed a lengthy supplementary expert report, which was also more detailed than anything Mr. Bates had gotten from the government to that point.  Given these late shifts in the focus of Mr. Bates's prosecution, and the technical nature of the evidence the government presented, we are concerned that he did not have enough time to adequately defend himself during his first trial.  See United States v. Verderame, 51 F.3d 249, 250–52 (11th Cir. 1995).  If Mr. Bates is retried on remand, we hope and expect that the District Court will be mindful of his need for expert assistance and adequate time to prepare for trial.

**VACATED AND REMANDED.**

19

HINKLE, District Judge, dissenting:

I respectfully dissent because I believe any error in the jury-selection process was harmless.

I

The defendant Cameron Dean Bates went to trial on child-pornography charges. The evidence of guilt was overwhelming. Mr. Bates says with more time he could have developed evidence supporting his defense, but he still has tendered none.

The undisputed forensic, objectively verifiable evidence included the following. Mr. Bates's laptop computer contained a large volume of child pornography. The laptop also contained numerous images of Mr. Bates nude or engaged in sexual conduct with men as well as sexually oriented craigslist advertisements that Mr. Bates placed. These materials were not password-protected. The laptop also contained legitimate, unobjectionable materials readily linked to Mr. Bates, including, for example, word-processing documents that he authored. Child-pornography images were accessed very close in time to when work was done on some of the materials readily linked to Mr. Bates. The compelling inference was that Mr. Bates not only worked on the materials readily linked to him but also accessed the child pornography.

20

There was no forensic, objectively verifiable evidence that anyone else ever used the laptop.  There were other computers in Mr. Bates's residence; there was no apparent reason why Mr. Bates would make the laptop available to others.  Family members said, though, that Mr. Bates left the laptop at the residence, readily accessible to family members and visitors, and that some used it.

The contested issue at trial was whether Mr. Bates accessed the child-pornography images, as the government contended, or someone else did it, as Mr. Bates contended.  Mr. Bates pointed to a friend of his son as the likely culprit.  The images of the defendant engaged in sexual conduct with men were admissible to show the unlikelihood that Mr. Bates would allow others—including his son's friend—to use the laptop.  The government had every right to prove those images.

Not surprisingly, the jury found Mr. Bates guilty.  On this evidence, any reasonable jury would have reached the same conclusion.

## II

Mr. Bates submitted in advance a comprehensive list of proposed voir dire questions.  The list did not include any questions dealing with bias against gays or relating to adult sexual conduct.  But during the jury-selection process itself, at sidebar, Mr. Bates's attorney asked the judge to inquire on the subject.  The attorney's entire request was this: "I think you should be asking some questions relative to homosexuality and preferences of people and so forth."  The judge said

21

he was not going to get into the subject during jury selection, that he did not know whether he was going to let in evidence on the subject, and that he would weigh probative value against prejudicial impact when the evidence was offered. Mr. Bates's attorney said, "That's all I asked." If not acquiescence in the judge's decision not to ask questions on this subject during the jury-selection process, this was surely close.

Whether the judge abused his discretion—in light of what the judge knew about the case and what the parties argued at the time—could be debated. It of course would have been preferable to ferret out any bias. But ferreting out bias is not easy; a simple question or two might not have made any difference. And questions on this subject might have adversely affected Mr. Bates, highlighting the issue of sexual conduct with men right from the outset. Not getting into a tangential matter during jury selection—thus leaving it to the attorneys to introduce the case for themselves during their opening statements—is ordinarily a reasonable approach. Mr. Bates did not suggest specific questions that would have addressed bias without getting into the facts of the case in a manner that would have harmed, not helped, Mr. Bates.

The judge of course <u>could</u> have addressed the subject of bias without prejudicing Mr. Bates. This could have been done, for example, through individual voir dire that could have been conducted quickly at side bar and that

22

could have addressed attitudes about child pornographers as well as adult sexual conduct, avoiding any statement about what Mr. Bates did or did not do.  But Mr. Bates never asked the judge to do anything of this kind.  In the absence of any more specific request, it is not at all clear that the judge abused his discretion.

III

If, as the majority holds, the judge abused his discretion, the case turns on whether the error was harmless.  The issue is this: is there a "reasonable possibility that [sexual-conduct-based] prejudice might have influenced the jury"?  United States v. Groce, 682 F.2d 1359, 1362 (11th Cir. 1982).  The majority recognizes this standard and suggests that whether prejudice "might have influenced the jury" means the same thing as whether prejudice "might have contributed to the conviction."  See majority opinion at 12 n.4.

The strength of the evidence is part of the analysis.  There is a reasonable possibility that prejudice against scientists might influence one's view on global climate change.  But there is not a reasonable possibility that prejudice against scientists might influence one's view on whether the sun rises in the east.  This is closer to a sun-rises-in-the-east case.

The judge's limiting instruction also is part of the analysis.  The judge told the jury to consider the evidence of Mr. Bates's sexual conduct with other men only on the issue of control of the laptop.  The majority notes that the limiting

instruction did not go as far as it could have, but Mr. Bates did not object to the instruction as given or ask for anything more. The judge also instructed the jury to decide the case without sympathy or prejudice for or against the government or Mr. Bates, to rely only on the evidence, and to decide only whether Mr. Bates was guilty of the specific crimes charged in the indictment. Again Mr. Bates did not object or ask for any further instruction on these matters. There is no reason to believe the jury failed to follow the instructions.

In light of the overwhelming evidence of guilt, and in the absence of any evidence of any juror's actual bias, I would hold that any error in the jury-selection process was harmless. There is no basis at all for any assertion that the jury convicted Mr. Bates because of bias against gays rather than based on the overwhelming evidence that he committed the child-pornography crimes with which he was charged.

IV

I acknowledge, though, that the harmless-error issue is reasonably debatable. Bias against those who engage in same-sex conduct exists. And the majority's position that any error was not harmless draws strength from the government's conduct at trial. The government repeatedly asked questions on this subject to witnesses who knew nothing about Mr. Bates's sexual encounters with men or the images on the computer. As the government knew before it asked the questions,

24

the witnesses could give no testimony on this subject having legitimate evidentiary value.  The government was plainly angling for prejudice.  At least in hindsight, this makes more problematic the failure to address bias during jury selection.

One is left asking why, if the evidence of guilt was as clear as I believe it was, the government asked improper, prejudicial questions.  A possible inference is that the government thought a conviction was not certain.  A possible inference is that the government thought at least some jurors were biased and that appealing to that bias would help bring about a conviction.  Why else would the government do it?

I am left in the uncomfortable position of concluding the government was wrong—that it didn't need the prejudicial impact it improperly pursued.  It is with no enthusiasm that I dissent.