[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16345
_____

D.C. Docket No. 4:15-cv-10001-JLK

RAYMOND BERTHIAUME,

Plaintiff-Appellant,

versus

DAVID T. SMITH,
individually,
CITY OF KEY WEST,
a Florida Municipal corporation,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 5, 2017)

Before HULL, JORDAN and GILMAN,[*] Circuit Judges.

PER CURIAM:

Raymond Berthiaume brought suit against Lieutenant David Smith of the Key West Police Department and the City of Key West ("the City") under 42 U.S.C. §§ 1983 and 1988 and Florida law, alleging claims of excessive force, false arrest, false imprisonment, battery/unnecessary force, and malicious prosecution, arising from Lieutenant Smith's October 2013 arrest of Berthiaume. Following a three-day trial, the jury returned a verdict in favor of the Defendants, and the district court subsequently denied Berthiaume's motion for a new trial.

On appeal, Berthiaume contends that he was denied a fair trial by an impartial jury. Berthiaume asserts, inter alia, that the district court abused its discretion in failing to ask jurors his proposed voir dire question, which was: "Do you harbor any biases or prejudices against persons who are gay or homosexual?" After review, and with the benefit of oral argument, we conclude that, given the particular facts and circumstances in this case described below, the district court abused its discretion in not asking that question. We explain why.

## I.  FACTUAL BACKGROUND

This case involved an altercation between two gay men who formerly had been partners. The following evidence was introduced at trial.

---

[*]Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

On the evening of October 26, 2013, Plaintiff Berthiaume attended the Fantasy Fest parade in Key West, Florida with his then-partner and now-husband, Jhon Villa, his friend Corey Smith, and his former partner, Nelson Jimenez.  After the parade, Berthiaume and his companions remained in the area for the street party that followed.  By the early morning hours of October 27, Berthiaume, Villa, and Smith were ready to go home and returned to their car, which was parked on a nearby street.  Jimenez was not ready to leave and remained in one of the area gay bars.

After waiting for Jimenez by the car for some time, Berthiaume returned to the bar to find Jimenez and escort him back to the car so that the group could leave.  As Berthiaume led Jimenez out of the bar with his hand on Jimenez's upper arm, Jimenez took the car keys from Berthiaume, twisted out of Berthiaume's grip, and ran down an adjacent alleyway.  Berthiaume, clad only in boxer shorts or a loin cloth and flip flops,[1] followed Jimenez to retrieve the keys.  During his pursuit of Jimenez, Berthiaume became frustrated and banged his hand against a street sign before continuing down the alleyway.

Lieutenant Smith and several other officers were on duty patrolling the Fantasy Fest area that night.  Lieutenant Smith and another officer observed the

---

[1] The witnesses agreed that Berthiaume was shirtless and wearing flip flops at the time of his arrest, but differed in their descriptions of the rest of Berthiaume's attire.  The police-officer witnesses described Berthiaume's outfit as a loin cloth, while Berthiaume and his companions stated that he was wearing boxer shorts.

3

interaction between Berthiaume and Jimenez as they left the bar and believed that they were witnessing a fight or altercation between the two men. Lieutenant Smith testified that Berthiaume appeared to be swatting and grabbing at Jimenez with both hands as Jimenez tried to pull away, while the other officer testified that the only physical contact that occurred between the two men was Berthiaume's grasping of Jimenez's upper arm as he attempted to escort Jimenez back to the car. Although Berthiaume and one of his companions testified that Berthiaume was walking as he followed Jimenez down the alleyway, Lieutenant Smith and other officers testified that Berthiaume chased Jimenez down the alley and that both men were running.

Lieutenant Smith and the other officers who were in the vicinity ran toward the alley to intervene. When he caught up to Berthiaume, Lieutenant Smith pushed Berthiaume in the shoulder to stop him from pursuing Jimenez, causing Berthiaume to fall to the ground. As a result of his fall, Berthiaume suffered a fractured wrist and jaw, both of which ultimately required surgery.

Lieutenant Smith spoke to Jimenez at the scene. Jimenez initially thanked Lieutenant Smith for intervening, but later stated that nothing wrong had happened, and he did not want to press charges against Berthiaume. According to Lieutenant

4

Smith, Jimenez told him that he and Berthiaume were former partners and that they were trying to get back together.[2]

Despite Jimenez's unwillingness to press charges against Berthiaume, Lieutenant Smith chose to arrest Berthiaume and charge him with domestic battery.[3]  Lieutenant Smith explained that "in domestic situations" such as this, "there is preferred arrest by the State of Florida" in order to ensure that the aggressor and victim are separated at least for the rest of the evening.  Lieutenant Smith further indicated that an arrest was appropriate regardless of Jimenez's desire not to press charges because Lieutenant Smith personally had observed the battery on Jimenez.  Lieutenant Smith also noted that victims of domestic battery sometimes "have different emotions for [the person who assaulted them] that make them not want to say something against that person because they don't want something bad to happen to them for their future."

## II.  MOTION FOR NEW TRIAL

The jury ultimately returned a verdict in favor of the defendants. Berthiaume filed a motion for new trial, arguing in part that he was deprived of a fair trial with an impartial jury when the district court refused to question the venire members regarding any potential bias they might have toward persons who

---

[2] Lieutenant Smith's arrest affidavit indicates that it was Berthiaume, rather than Jimenez, who provided this information to the officers.

[3] The State subsequently declined to prosecute Berthiaume.

are gay or homosexual.  Berthiaume noted that homosexuals had only recently begun to gain acceptance in society, and many people still harbor bias or prejudice against homosexuals.  Accordingly, Berthiaume contended that in a case such as his, involving both a gay party and gay witnesses, it is necessary for courts to inquire into prospective jurors' potential biases against homosexuals to ensure a fair trial.

The district court denied Berthiaume's motion for new trial.

### III.  DISCUSSION

In the context of racial bias, the Supreme Court has held that, under "special circumstances," the Constitution may require district courts to ask questions concerning racial bias—specifically, where racial issues are "inextricably bound up with the conduct of the trial," and there are substantial indications that racial prejudice would likely affect the jurors.  Rosales-Lopez v. United States, 451 U.S. 182, 189-90, 101 S. Ct. 1629, 1635 (1981) (internal quotation marks omitted).  The Supreme Court also indicated in Rosales-Lopez that questions regarding racial bias may still be warranted in the absence of such special circumstances, but that a district court's failure to ask such questions will be reversible only if the circumstances of the case indicate a reasonable possibility that racial prejudice might have influenced the jury.  Id. at 190-91, 101 S. Ct. at 1635-36.

6

In one unpublished case, this Court relied on this racial-bias precedent in holding that the district court reversibly erred by failing to inquire about sexual-orientation bias during voir dire. See United States v. Bates, 590 F. App'x 882 (11th Cir. 2014). In Bates, the defendant was charged with numerous child pornography offenses. Id. at 883-84. In addition to finding child pornography on his computer, investigators found evidence indicating that Bates used the internet to meet other men for sexual encounters, as well as photographs of Bates engaged in sex acts with other men. Id. at 884-85. Bates sought to suppress that evidence, but the district court determined that it was relevant to establish his ownership and use of the computer. Id. Anticipating that the evidence of his private life would come out during trial, Bates then requested that the district court question prospective jurors "about any prejudice they might harbor against him on the basis of his sexual activity with other men," which the district court declined to do. Id. at 884-85. During the trial, evidence regarding Bates's sexual activities with other men was "repeatedly paraded before the jury," and the jury ultimately convicted Bates on all counts. Id.

Here, as in Bates, Berthiaume's sexual orientation and that of his witnesses became "inextricably bound up with the issues to be resolved at trial." See id. at 887 (internal quotation marks and citation omitted). In describing the events leading up to Berthiaume's arrest, the witnesses repeatedly testified about

7

Berthiaume's romantic relationships with Jimenez and Villa.  Indeed, in explaining why he felt it necessary to arrest Berthiaume despite Jimenez's refusal to press charges, Lieutenant Smith explained that victims are often reluctant to press charges in "domestic situations" such as these because they have mixed emotions about the perpetrator.

Moreover, as in Bates, the district court here "did not ask any questions specific enough to determine whether any of the jurors might harbor prejudices against [Berthiaume] based on his sexual relationships."  See Bates, 590 F. App'x at 887.  Nor were the district court's general inquiries regarding the jurors' ability to be impartial and its instruction that jurors not be prejudiced against witnesses based on the witnesses' backgrounds sufficient "to reach the important concerns highlighted by [Berthiaume's] proposed inquiry," as they were "broadly framed" and "not calculated to reveal latent prejudice."  See id. (internal quotation marks omitted).  As a result, the district court abused its discretion by failing to inquire about prejudice on the basis of sexual orientation during voir dire.  Id.

Further, the Defendants have not shown "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," and thus, Berthiaume is entitled to reversal.  See id. at 888 (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)).  At the time of voir dire, the jury had no reason to know that Berthiaume's sexual orientation or that of his witnesses

would be a part of the evidence at trial.  Consequently, "they had no reason to offer up prejudices they might harbor on that basis when the District Court posed its general questions" regarding bias.  See id. at 889.  Moreover, the district court asked the jurors multiple questions about any biases or prejudices they might have against law enforcement.  But the district court refused to ask any questions about prejudice on the basis of sexual orientation.  Therefore, we have no way to discern whether the jury was biased against Berthiaume for that reason.  See id.  Given the repeated testimony at trial concerning Berthiaume's homosexual relationships with Villa and Jimenez, and the characterization of the altercation that led to Berthiaume's arrest as a domestic dispute, the risk that latent, undiscovered prejudices may have influenced the jury's verdict is substantial.  Id.

## IV.  CONCLUSION

For the foregoing reasons, we vacate the district court's final judgment in favor of the Defendants and remand for a new trial.

**VACATED AND REMANDED.**[4]

---

[4] In light of our decision, we need not consider Berthiaume's alternative ground for a new trial based on the Defendant's exercise of peremptory challenges in alleged violation of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), and its progeny.